## THE PEOPLE v. HENRY HESS.

*Criminal law—Seizure of gaming tools—Policy-shop—Municipal ordinance—Evidence—Conduct of prosecutor.*

1. A police officer who, in the performance of his duty, enters a place to which the public are invited, and which they are in the habit of entering, and finds gambling going on, and the implements of the game scattered around the room, has as much right to seize the tools and things used in the unlawful game as if armed with a search-warrant, and may keep and use them as evidence against the persons using them.[1]

2. Unfavorable comments by a prosecuting officer, in his argument to the jury in a criminal case, upon the failure of the respondent to testify in his own behalf, standing alone, furnish ground for setting aside a conviction; but in this case the error is held to have been sufficiently cured by the immediate disclaimer on the part of the officer of any intention to prejudice the case by such remarks, and the further statement that no presumption could be raised against the respondent by such failure to testify, supplemented by the instruction of the court that the jury were not to consider such fact in their deliberations.

[1] See *Hastings v. Haug, ante,* 87.

3. It is not proper for the prosecuting officer to tell the jury that he *believes* that the respondent is guilty, but he has the right to argue from the testimony the fact of his guilt, and to state to the jury what evidence before them convinces him, and should convince them, of such guilt.[1]

4. The common council of Detroit have power, under the provision of the charter of 1886 authorizing them to prohibit, prevent, and suppress all lotteries for the drawing or disposing of money, or any other property whatsoever, to pass an ordinance prohibiting the keeping of a policy-shop and the game of policy, which is a lottery.

*Certiorari* to recorder's court of Detroit. (Chambers, J.) Submitted on briefs February 4, 1891. Decided February 27, 1891.

Respondent was convicted of maintaining a policy-shop. Affirmed. The facts are stated in the opinion.

*Walter Barlow* and *Edwin F. Conely*, for respondent.

*Charles W. Casgrain* and *Charles S. McDonald*, for the people.

MORSE, J. The defendant was convicted in the recorder's court of the city of Detroit of having on March 14, 1890, within the corporate limits of said city, at No. 258 Hastings street, unlawfully and willfully kept, carried on, and maintained a policy-shop, the same being a scheme for drawing and disposing of money. There was also a count in the warrant for aiding in keeping, carrying on, and maintaining such policy-shop. All this in violation of an ordinance of said city, being section 3, chap. 64, p. 150, of the Revised Ordinances of 1884 of the city of Detroit. The conviction is brought into this Court for review by writ of *certiorari*.

The provisions of the ordinance alleged to have been violated are as follows:

_____

[1] See *People v. Welch,* 80 Mich. 616.

85 MICH—9.

"No person shall keep, carry on, or maintain, or aid in keeping, carrying on, or maintaining, any lottery, policy, pool, bucket-shop, board of trade, or any like scheme or place, for drawing or disposing of money, wheat, or other property, within the city."

It is provided in the charter of the city of Detroit that—

"The common council * * * may also prohibit, prevent, and suppress all lotteries for the drawing or disposing of money, or any other property whatsoever, and punish all persons maintaining, directing, or managing the same, or aiding in the maintenance, direction, or management thereof." Charter 1886, chap. 7, § 49, p. 83.

The errors relied on are as follows: That the court erred in admitting in evidence certain papers and other things found by the officers at No. 258 Hastings street, on March 14, 1890, at the time the defendant was arrested.

The testimony shows that when the officers visited No. 258 Hastings street, on March 14, 1890, they found, up-stairs in the building, the defendant, standing behind a counter, upon which were small pieces of paper in rows, with money upon them. There were two rooms. In the front room there were two colored men, two white men, and one colored woman. As one of the officers entered this room the colored woman went through into the other room. She had a piece of paper and 10 cents in her hand. In this room was Hess, standing behind the counter, with a stencil in his hand. The colored lady put the piece of paper and the 10 cents down upon the counter. She turned around, and saw the officer, and then walked out. The piece of paper that she laid down had figures upon it. In the same room were also two colored men and two colored women. These were sitting at a table, with pencils and paper in their hands. The

officers scraped up the papers and the money on the counter. The money was in small change, and amounted in all to about three dollars. They also found a dream-book, which they also took away with them. They also arrested Hess, and took him to the police station, and locked him up. The next day a complaint was made against him, and the warrant issued, upon which he was tried and convicted. Hess, at the time the officers were in the room, was asked what he was doing. He said: "Can't you see? It is the game of policy." He was asked how long he had been running it, and he said, "About two weeks." He said he was not the proprietor, but was running it for a man by the name of Miller. The articles introduced in evidence were these pieces of paper and the dream-book. The papers had figures upon them, and were evidently used in the game of policy, a description of which can be found in the case of *People v. Elliott*, 74 Mich., at pages 265, 266, and need not be given here.

It is contended that the officers had no right to enter this building and take these papers without a search-warrant duly procured, and that the seizure of the papers was illegal, and therefore they could not be used as evidence to convict respondent. It must be remembered that this was not a private house, but a place open to the public. The officers walked in peacefully and without objection, and found the parties therein engaged in an unlawful business. Under such circumstances they had an undoubted right to seize and take into their possession the papers and other things then being used in such unlawful business, and to retain the same, and to use them thereafter as evidence against the defendant. This is not a case of the home or business place of a citizen being thrown open by the police at their will for inspection, that evidence may be found and seized to

criminate such citizen, against which the counsel in his brief so eloquently invokes the aid of the Constitution and our laws; but it is the case of a police officer, in the course of his duty, walking into a place where the public are invited and in the habit of entering, and finding gambling going on, and the implements of the game scattered about the room. In such a case the officer has an undoubted right to seize the tools and things used in the unlawful game, and to keep them, and use them in evidence against the persons using them. Finding these things, as they did, and in use in gaming, the officers had as much right to seize them under the law as if they had been provided with a search-warrant under the statute.

Other objections are made to the admission of testimony, which we consider unimportant. The conversation in which the respondent, Hess, said he was running a policy-shop was objected to; and it is argued here that this conversation, being a confession of the respondent, cannot be used to prove the *corpus delicti*, as there was no other testimony tending to show it. A sufficient answer to this objection and argument is the statement of what the officers saw in the room, and what they found there, already heretofore mentioned. There was other proof than the confession of the respondent that he was running a policy-shop there that day.

The other assignments of error are directed against the argument of Mr. Casgrain, the city attorney, to the jury. Mr. Casgrain said to the jury:

"If the respondent had any explanation to make, or any statement to deny the evidence introduced, and to show that he was not maintaining a place for the purpose of carrying on a game of policy, why did he not take the stand, and deny the testimony that we introduced that he was carrying on a policy-shop?"

After an exception was taken by defendant's counsel to

this and other remarks by Mr. Casgrain, Mr. Casgrain said:

"I desire to say this, gentlemen of the jury: I desire to treat this case fairly, so far as this defendant is concerned. I want to make this statement to you: I will ask the court to charge this jury that under the Constitution of this State and under the authorities of this State—mark my words well—under the Constitution of this State and under the statutes of this State the fact, gentlemen of the jury, the fact that the defendant fails to take the stand in his own behalf raises no presumption as to his guilt, and I desire, if I made any remarks different from that before, I now quote to you what I believe to be the law under the Constitution and under the statutes of this State. No presumption can be raised against him that he is guilty because he failed to take the stand, and I will ask the judge to charge you that such is the law."

And the court said to the jury that they were not to take into consideration the fact that the defendant did not go on the stand.

"He is not obliged to, and our courts have decided that this shall not be taken against him,—the fact that he does not go on the stand."

Thus all was done that could be done to cure this error of the city attorney, both by himself and the court; and we do not think the case is such that it calls for a reversal because of Mr. Casgrain's remarks at first, although they were highly improper, and in violation of the statute, and, standing alone, without the subsequent action of Mr. Casgrain and the court, would have been sufficient cause to set aside the verdict.

Mr. Casgrain also said to the jury that, if he thought the evidence introduced was not sufficient to warrant a conviction, it would be his duty so to state to them; and that if, when a complaint came in, he thought there was sufficient evidence to warrant the taking of the complaint, he would be derelict in his duty, under his oath of

office, if he did not prosecute.    It is claimed that this might be taken by the jury as an intimation on the part of the prosecution that he believed the defendant guilty, and therefore improper.    It is not proper for the prose_ cuting officer to tell the jury that he believes the defendant guilty, as his belief is not evidence in the case; but he has the right to argue from the testimony that the defendant is guilty, and to state to them what evidence before them convinces him, and should convince them, of such guilt.    To deny to a prosecuting officer this privilege would be to deny to him the right to place before the jury the logic of the testimony which leads his mind to the inevitable conclusion of guilt, and which he has the right to presume will lead them to the same conclusion if they view it as he does; and he has, I think, the right to state that he stands unbiased between the people and the respondent, as we have often said he ought to stand.    No prejudicial error, in my opinion, arises out of any remarks made by Mr. Casgrain upon the trial.

We think that the keeping of a policy-shop comes within the ordinance, and that the common council had power under the charter to pass the ordinance in so far as it relates to policy-shops and the game of policy, which is a lottery.

We find no error in the conviction, and it must stand affirmed.

The other Justices concurred.