PEOPLE v. CONA.

1. CONSTITUTIONAL LAW — SEARCHES AND SEIZURES — EVIDENCE — WITNESSES—HOMICIDE—CRIMINAL LAW.
   Since it is the right and duty of the police to search any person who is taken into custody and his room or the place in which he may have been arrested, no constitutional right of a respondent was violated in searching his room and taking possession of two revolvers which were found there; nor was it erroneous, in a murder case, to require him to answer a question whether the weapons belonged to him.

2. WITNESSES—CROSS-EXAMINATION—MURDER.
   A respondent that took the witness stand in his own behalf, in a prosecution for the killing of a police officer, might be asked whether he had had trouble with the officers of the city at other times, as a preliminary to an inquiry into the matter of previous convictions.

3. CRIMINAL LAW—TRIAL—HOMICIDE—ARGUMENT.
   Where the respondent had denied that he had been convicted of any former offenses, and subsequently admitted that he had been arrested and convicted, the prosecuting attorney was entitled to comment in his argument upon the veracity of the accused and draw inferences from apparent inconsistent statements.

4. SAME—CONDUCT OF COURT—MURDER.
   Nor was it prejudicial to the rights of the respondent for the court, during the argument of the prosecuting attorney, to warn counsel for the accused not to interrupt but to take his exceptions.

5. SAME—NEW TRIAL.
   Held, also, that a new trial was not improperly denied upon affidavits of the defense wholly or partly met or contradicted by affidavits of the prosecution, relating to newly discovered evidence.

Error to the recorder's court of the city of Detroit; Phelan, J. Submitted April 23, 1914. (Docket No. 174.) Decided June 1, 1914.

180 MICH.—41.

Francesco Cona was convicted of murder in the first degree. Affirmed.

*Grant Fellows,* Attorney General, *Hugh Shepherd,* Prosecuting Attorney, and *Arthur W. Kilpatrick,* Assistant Prosecuting Attorney, for the people.

*Louis J. Colombo (Cassius Hollenbeck,* of counsel), for respondent.

Respondent was convicted of the crime of murder in the first degree. The crime was committed about 8 o'clock in the evening of July 19, 1913, in the city of Detroit. The victim was Charles W. Schoof, a member of the metropolitan police force of that city. The circumstances surrounding the tragedy are depicted by witness George H. Raedle, as follows:

"I am an officer of the metropolitan police force. I was on duty the night of the 19th of July last. I met officer Charles W. Schoof that evening around 8 o'clock, a few minutes before 8, at Clinton and Hastings. After meeting him, we went through the alley between Clinton and Mullett and Hastings and Rivard. That alley runs east and west, parallel with Clinton. Officer Schoof and I entered the alley off Hastings street. He stayed in the middle of the alley for some purpose, and I walked down to the end of the alley on Rivard street. I saw these two men on the end of the alley on the other side of Rivard street. They were on Rivard street between Clinton and Mullett, one looking up Rivard street toward Gratiot avenue and the other looking the opposite side toward Clinton street. Cona was one of them. When I saw them I went back in the alley and told Officer Schoof. I told him I would go between the houses onto Mullett street, go down Mullett, and come in between the houses again, and intercept the men from the opposite side of the alley. He was to stay in the alley until he heard my signal, rapping a club. I went through between the houses onto Mullett, went east on Mullett five or six lots, and went in between the houses again into the alley where the men were, the alley between

Rivard and Russell streets. Where I came back into the alley I was nearer Rivard than Russell. These two men were sitting on the tongue of a dirt wagon. Defendant was one of these two men. When I was between 50 and 60 feet away from them, I flashed my light and rapped my club at the same time and said nothing to them. They both started to run and ran west toward Rivard street. Officer Schoof came across Rivard street to the corner of the alley and tried to get hold of Cona, the defendant. I did not see the other man any more. As Schoof reached out his hand and tried to get hold of Cona, the shot was fired by defendant. I was then between 20 and 30 feet from Schoof and defendant. I could not say exactly; I did not measure it. After firing the shot defendant ran north on Rivard street to Mullett. Schoof fell there, right in the end of the alley. I ran after the defendant. I did not succeed in catching up to him. When I last saw him, he was in the middle of Mullett street between Hastings and Rivard. A crowd of people came there and obstructed my view of him when I got up to Hastings street. Just one shot was fired. After losing sight of the defendant, I went to the patrol box and called up the flying squadron. I then went back to where Schoof was lying and found that they had taken him away. I had never seen Cona before that evening. It was not over two minutes between the time I first saw them in the alley and the time Schoof was shot. I next saw the defendant in his home in bed, 2 o'clock Sunday morning. This was Saturday night. No words were spoken by me or Schoof during the time I saw these men in the alley. They said nothing to us. Schoof had not laid his hand on the defendant at the time the shot was fired. I assisted the central men, Graus and Roggers, in placing defendant under arrest at his home, 21 Fort street east. I went along with the officers from the central precinct. We found him there in bed. When I flashed my light on the defendant, I got a good look at him. There are two street lights around there. This happened around 8 o'clock. I met Schoof nearly 8 o'clock. This happened about four minutes afterwards. It was just beginning to get dark; it was in July."

Witness John J. O'Rourke, likewise a member of

the police force, testified that he met defendant on the evening in question at 12 or 13 minutes to 8 at the corner of Orleans and Mullett streets, four blocks from the scene of the tragedy; that on that occasion he spoke to defendant; and that he had known him since July 5th.

Stephen J. Martin, a policeman, gave evidence to the effect that he found two revolvers in a sewing machine drawer in the house from which defendant was taken. This testimony was all that was offered on behalf of the people at the outset. The defendant was then sworn in his own behalf and on direct examination denied his guilt. On cross-examination he was shown the two revolvers and asked if they were his. Over objection he was permitted to answer that they were. To this ruling defendant excepted. The following then occurred:

"*Q.* Now, since you have been in Detroit, have you had any other trouble with officers, police officers?

"*Mr. Colombo:* Objected to as incompetent and immaterial.

"*The Court:* No, it is competent. (Exception for defendant.)

"*A.* No, I never had any trouble.

"*Q.* Didn't you have trouble with Officer O'Rourke, who was just on the stand?

"*A.* No, sir.

"*Q.* Did you ever see him before? Officer O'Rourke, will you stand up? I mean this officer here.

"*A.* I saw him at the station.

"*Q.* When?

"*A.* Yes, sir; he arrested me once, because of owing my mother money.

"*Q.* That was in the month of July, wasn't it?

"*A.* I don't remember when.

"*Q.* You threatened him and said you would get him, didn't you, shortly before the 19th of July?

"*A.* No, sir; I never threatened him. I always spoke to him nice. I never threatened him.

"*Q.* Have you ever been arrested and convicted of any offense?

"*A.* No, sir."

Redirect examination: By *Mr. Colombo:* "*Q.* Wait a minute, Frank. Your mother had you arrested, and you went up to the House of Correction, and then she went up and paid your fine?

"*A.* Yes, she paid $60.

"*Q.* Your mother had you arrested, and then she thought she did you an injury, and then she went up and paid your fine?

"*Mr. Kilpatrick:* Never mind what she thought.

"*Mr. Colombo:* I am asking him; the mother must have told him about it.

"*Mr. Kilpatrick:* This is not competent, what his mother thought."

Recross-examination: "*Q.* So you were arrested and convicted?

"*A.* Yes, my mother had me arrested, and she paid the fine.

"*Q.* And you served some time in the House of Correction, didn't you?

"*A.* No, I didn't serve; paid the fine.

"*Q.* How long were you in jail?

"*A.* About three days.

"*Q.* You were fined about $35, weren't you—$50?

"*A.* I don't know; my mother paid $50 or $60.

"*Q.* Your mother paid $50 or $60. Weren't you arrested after your mother paid your fine, and did not the judge suspend sentence and tell you to move away from that neighborhood, that you were causing too much trouble?

"*Mr. Colombo* (to the interpreter): Give the answer.

"*A.* Yes, and I did move away.

"*Q.* Where were you living at that time?

"*A.* I do not remember the number; only lived there a little while.

"*Q.* What part of the city was it?

"*A.* Near the city hall. That is the nearest he can say.

"*Q.* Now, we have gotten you to admit this, that you were arrested and convicted, after you had denied it. Were there any other times that you were arrested and convicted?

"*A.* No, sir.

"*Q.* Is there as much truth in that answer as the other answer you gave when you denied being—I withdraw that. How long have you had these revolvers?

"*A.* One of them I found, and the other one was given to me by a friend in New York, given me for a present, about three or four years ago.

"*Q.* So you have had one three or four years. How long since you found the other one?

"*A.* I don't remember. I found it in the country somewheres.

"*Q.* Since you came to Detroit?

"*A.* I found it in New York.

"*Q.* That is all."

Redirect examination: "*Q.* Frank, these two times you were arrested was because you and your mother had a few words?

"*Mr. Kilpatrick:* I object to that, your honor.

"*The Court:* I sustain the objection.

"*Mr. Kilpatrick:* That will be trying this case over again.

"*Q.* What were you arrested for, assault and battery, or what was the nature of the offense?

"*The Court:* If you are going to inquire about these former arrests, my brother, the best thing would be to bring up the records of the court below, because you cannot give oral testimony of convictions. Bring up the complaints and the papers from the other courts.

"*Mr. Colombo:* I can ask him what the nature of the offense was, can't I?

"*The Court:* The complaint is the best evidence; that would be only hearsay.

"*Mr. Colombo:* He brought it out; I want to show the nature of the offense.

"*Q.* Frank, this gun here is no good, is it?

"*A.* No, sir."

Defendant then introduced the evidence of several witnesses which, if true, tended to establish an *alibi*. The people then recalled the witness O'Rourke, who gave testimony to the effect that he had arrested the defendant on the 7th day of July, preceding the homi-

cide, and appeared in court against him; that on that occasion the defendant threatened him:

"He looked at me and shook his finger a little bit and called me a name, and said he would get me. He called me a son of a bitch, and said he would get me. * * * I have seen him several times since the 5th of July and am positive that I saw him near the corner of Mullett and Orleans on the evening of the 19th of July."

The foregoing constitutes practically all the testimony offered in the case.

During the closing argument of the assistant prosecuting attorney, the following occurred:

"*Mr. Colomobo:* I take an exception to the statement of Mr. Kilpatrick that the defendant has shown himself to be a self-confessed liar. I take an exception to that statement.

"*The Court:* Just a moment. You may argue, the prosecuting attorney may argue, the statement made by the defendant; but I won't permit any statement of that kind to be made. Besides the counsel for defendant went far in his statement to the jury, when he said, if he was the prosecuting attorney, he would take this case from the jury.

"*Mr. Kilpatrick:* That is what I am answering now.

"*The Court:* He said counsel for the defendant had no right to make any such statement, and I am telling counsel for defendant now that, as a matter of law, the prosecuting attorney would not have any right to do anything of the kind.

"*Mr. Colombo:* I said I would recommend the case be taken from the jury.

"*The Court:* I don't see how that is possible—my brother is familiar with the criminal law—how that is possible in view of the statement here of the testimony of one of the police officers, who positively identified this man.

"*Mr. Colombo:* Only, your honor, as being so improbable in view of the other testimony.

"*The Court:* I know, but it is the jury that determines those questions, and not the prosecuting attor-

ney or you, or myself. That is what these twelve men are sitting here for. You may proceed, Mr. Prosecutor.

"*Mr. Kilpatrick:* I say to you, gentlemen of the jury, that I would be highly derelict in my duty if I had done what my brother says I should have done, in the face of the testimony submitted by the people, when the testimony that rebuts that is the·kind it is. Now, what did the defendant testify to? And didn't he perjure himself when I asked him if he had ever been arrested and convicted, and what did he say? 'No.' Finally we dragged out of him an admission that he had been convicted once. Didn't he perjure himself when he denied that?

"*Mr. Colombo:* Give me an exception.

"*Mr. Kilpatrick:* Then dragged out of him an admission, after he denied it, of another conviction, and didn't he perjure himself when he denied that conviction? (Exception for defendant.) So I say to you, gentlemen of the jury, that I am justified when I say that he is a self-confessed perjurer. Now, there is one of those witnesses that has testified to an *alibi* for the defense, whose testimony you are justified in throwing out, and not believing at all, and they have not shown anything here that would justify us in throwing out the testimony of Officer O'Rourke, or Officer Raedle, and I say it is not very good taste in my brother to stand up here and call Officer O'Rourke a liar, and Officer Raedle a liar, and advance the theory to you that they are simply coming in here and telling this story from fear of their superior officers. I say that is all poppy-cock. I would not have much respect for the police department of the city of Detroit or for the officers in charge of this department, if they will allow their subordinates to put anything over on them like this. (Exception for defendant.) And I challenge the statement of my brother that O'Rourke is a liar, when he comes in here and says positively he identifies this man, and knew it was the same one, four blocks from where the crime was committed. My brother asks me a question, 'What was the motive of this man?' I will answer that, first of all, by asking you another question, What was his motive when he tried to kill his whole family, his own flesh and blood? What motive would he have then?

(Exception for defendant.)   Because he is a depraved character; that is the reason.  (Exception for defendant.)   Yes, exceptions don't prove anything.

"*Mr. Colombo:*   They will in the Supreme Court, if we go there.

"*Mr. Kilpatrick:*   Take every exception you want. You know that is the testimony drawn out on your own cross-examination of Officer Roggers, that this man tried to kill his whole family; at least, his family told the officer that.   That is the kind of a man he wants you to believe.   The other people, we don't know who they are; we don't know what they are.

"*Mr. Colombo:*   No, you don't want to know.

"*Mr. Kilpatrick:*   Are you going to continue to interrupt me: I will appeal to the court.

"*Mr. Colombo:*   Well, be fair.

"*Mr. Kilpatrick:*   I did not interrupt you.

"*The Court:*   Now, listen; no more interruptions. Take your exceptions to his argument, if you have got any to make.   He didn't interrupt you.   Let him finish.

"*Mr. Colombo:*   I take an exception.

"*Mr. Kilpatrick:*   The motive, the theory that the people have worked on in the case, is this, gentlemen of the jury:   We won't say that the defendant took a violent dislike to Officer O'Rourke alone; he may have done that.   The two beats ran together, and he may have taken such a dislike to O'Rourke that in the excitement and suddenness of Schoof coming up there, he thought it was O'Rourke, and he pulled the revolver and shot him dead.   That may have been it from what we have learned here today of the character of this man, it is fair to assume that he took a violent dislike to the whole police force, just the same as he did to his whole family, and that he was ready with this revolver that he claims that he carried for four years or so (exception for defendant) to shoot down on the slightest provocation.   (Exception for defendant.)   Now there are two motives.   That is, the dislike to Officer O'Rourke, because he arrested him the other time, because he would not go back with him, especially taking into consideration the fact that he had threatened him.   Of course, my brother says O'Rourke is not to be believed, I suppose, on that; but I believe him.   I believe him, and I believe he did

threaten him. Now, that is one theory of the prosecution. The other is that because of his being mixed up, as he was, with the police department on different occasions, because of his depraved character, he took a violent dislike to the whole police force. (Exception for defendant.) And therefore, when Schoof suddenly appeared at the entrance of that alley, he pulled his gun and shot him, rather than be taken in, as he had been on two previous occasions. Now, gentlemen of the jury, you have heard the testimony of these officers in front of you. It makes out an absolute case against the defendant, and you have this *alibi* testimony, and I repeat again, and ask you to do, as I think the court will instruct you, to consider that testimony very, very carefully, because it is easy to prove and hard to disprove; and think, also, gentlemen of the jury, of the interests of these witnesses in this case. They have an interest; they want to see their man free. (Exception for defendant.)

"*Mr. Kilpatrick:* They do not care how far they go. (Exception for the defendant.)"

After conviction respondent made a motion for a new trial based principally upon the claim of newly discovered evidence. Several affidavits were filed in support of the motion; the general tenor of which being that the several affiants had seen a man running away from a policeman with a revolver in his hand immediately after the tragedy, and that the respondent was not that man. In denying the motion for a new trial, the court said:

"Counsel for defendant has filed the affidavits of Hattie Eisenstark, Mrs. Dora Webber, Arthur N. Webber, Mrs. Benjamin Behrman, Leo Fritz, Mrs. Schremser, Pellero Cemero, and Paul Krueger, which tend to prove that on the night in question they saw a man run along Rivard and other streets in the vicinity; that he had a revolver in his hand, but it was not defendant Cona. These affidavits may or may not be true.

"Officer Raedle claimed that he positively identified the defendant when he saw him 25 or 30 feet away; that he had good light from Rivard and Clinton streets

100 feet away, and also good light from Mullett street on Rivard. Officer O'Rourke positively identifies the defendant as the person with whom he spoke on the southwest corner of Orleans and Mullett and states the defendant was then walking towards Rivard street.

"I have given the matter careful consideration, because of the seriousness of the offense and the punishment which it carries, life imprisonment, and I do not find anything in the affidavits filed on behalf of the defendant, asking for a new trial, which would justify me in setting aside the verdict of the jury.

"The defendant had a fair and impartial trial, and was defended by a learned counselor of the law. The killing was as brutal as it was cowardly. It is a felony under the law of this State, since 1911, for persons to carry dangerous weapons upon their persons, concealed, without a license, and many officers have been killed when approaching men for the purpose of ascertaining whether they are so armed. I am satisfied from a careful examination of all the evidence in this case that Officer Schoof met his death while attempting to learn whether the defendant at the bar was armed with a dangerous weapon on the night in question.

"The motion for a new trial is overruled."

An exception was taken by defendant to this ruling.

BROOKE, J. *(after stating the facts).* There are 18 assignments of error. The first two relate to the ruling of the court in permitting the witness Martin to answer the question, "I will ask you whether or not you found these revolvers there?" and in compelling the defendant Cona to answer the question, "And they are your guns, aren't they?" It is urged on behalf of defendant that the seizure of the revolvers in question was in violation of the Federal Constitution, citing *Weeks* v. *United States,* 232 U. S. 383 (34 Sup. Ct. 344). A reading of the opinion in that case makes it apparent. that the principles there announced and relied upon by the defendant are not applicable in the case at bar. *People* v. *Adams,*

176 N. Y. 351 (68 N. E. 636, 63 L. R. A. 406, 98 Am. St. Rep. 675); *Smith* v. *Jerome,* 47 Misc. Rep. 22, 93 N. Y. Supp. 202. In the latter case it is said:

"The police have the power and it is also their duty to search the person of one lawfully arrested, and also the room or place in which he is arrested, and also any other place to which they can get lawful access, for articles that may be used in evidence to prove the charge on which he is arrested."

The third assignment is based upon the ruling of the court in requiring the defendant to answer the question, "Now since you have been in Detroit have you had any other trouble with the officers, the police officers?" We are of opinion that the defendant having offered himself as a witness in his own behalf could be interrogated as to his former convictions, and the question objected to was, as shown by the testimony quoted, simply preliminary to that investigation.

Assignments of error 4, 5, 6, 7, 8, and 9 refer to alleged improper argument made by the prosecuting attorney on behalf of the people. That argument has been set out in the statement of facts. Defendant bases these exceptions upon the cases of *People* v. *Quick,* 58 Mich. 321 (25 N. W. 302); *People* v. *Treat,* 77 Mich. 348 (43 N. W. 983); *People* v. *Lieska,* 161 Mich. 630 (126 N. W. 636); *People* v. *Huff,* 173 Mich. 620 (139 N. W. 1033). There can be no difference of opinion as to the ruling announced in these cases. It is the duty of the prosecutor to protect the innocent as well as to pursue the guilty and to maintain an impartial attitude in the conduct of his case. But this court has never held that it is improper for the prosecutor to comment upon the testimony in the case and to draw warrantable inferences therefrom. *People* v. *Winslow,* 39 Mich. 505; *Driscoll* v. *People,* 47 Mich. 413 (11 N. W. 221); *People* v. *Welch,* 80 Mich.

616 (45 N. W. 482); *People* v. *Hess*, 85 Mich. 128 (48 N. W. 181); *People* v. *Tubbs,* 147 Mich. 1 (110 N. W. 132).

In the sixth assignment of error a further complaint is made of the language of the trial judge in admonishing counsel for defendant in these words:

"Now, listen; no more interruptions. Take your exceptions to his argument if you have got any to make. He didn't interrupt you. Let him finish."

That portion of the argument of the prosecutor set out in the statement of facts indicates very frequent interruptions on the part of defendant's counsel and may be held to justify the statement by the court. A similar remark by the court in the case of *People* v. *Ecarius,* 124 Mich. 616 (83 N. W. 628), was held to be insufficient upon which to order a new trial.

Assignments of error numbers 10 to 13, inclusive, are based upon alleged erroneous instructions to the jury. No requests to charge were preferred on behalf of the defendant. A careful examination of the charge convinces us that the rights of the defendant were carefully guarded by the court. At the conclusion of the charge the court inquired of counsel for defendant if there was anything further he desired to have him charge, to which counsel responded: "That is all, your honor; thank you."

Error is assigned upon the refusal of the court to grant a new trial because of newly discovered evidence. We have examined the affidavits filed in support of that motion. They are all dated more than two months after the date of the homicide. Affidavits filed by the prosecution in opposition to the motion cast doubt upon some of the statements contained in the affidavits filed upon the part of the defense. In view of the positive identification of the defendant by Officer Raedle and the fact that he was seen in the vicinity of the scene of the crime within a few min-

utes of the commission thereof, we cannot say that the trial judge abused his discretion in declining to grant the motion.

The conviction is affirmed.

McALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.