### PEOPLE v. HUFF.

1. CRIMINAL LAW—EVIDENCE—TRIAL—LARCENY.

    It was improper, upon the separate trial of one of two joint respondents charged with larceny, to permit the prosecuting attorney to cross-examine a witness who was produced to testify to the good character of respondent, relative to acts of the other respondent subsequent to the alleged crime, on an occasion when she was engaged in identifying property stolen at other times and from other persons than those mentioned in the information.

2. SAME—OPINIONS—WITNESSES.

    Opinions of a witness as to respondent's character, formed subsequent to the date of the alleged offense and after some of the facts had been made public, are not admissible to prove or disprove good character.

3. SAME—CHARACTER—REPUTATION.

    Witnesses called to attack or defend character can be asked on direct examination only as to the general character of the person in question, and will only be allowed to testify as to particular facts or instances upon cross-examination with a view to test the value of the testimony given: but cross-examination must be confined to acts occurring before the offense charged.[1]

4. SAME—TRIAL—WITNESSES—CONDUCT OF PROSECUTOR.

    It was also error for the prosecuting attorney to attack one of respondent's witnesses, accusing her, without proof, of having knowingly received stolen goods.

5. SAME.

    And it was equally improper for the prosecuting attorney to praise one of the people's witnesses and to extol his skill and ability to detect wrongdoers.

---

[1] The authorities on the right of a witness to testify to character from personal knowledge are collated in a note in 22 L. R. A. (N. S.) 650.

    As to evidence of specific instances to prove character, see extensive note in 14 L. R. A. (N. S.) 689; and for the admissibility of particular acts or specific traits of defendant, generally, see note in 20 L. R. A. 614.

6. SAME—APPEAL AND ERROR—SAVING QUESTIONS FOR REVIEW.
Upon counsel for respondent calling the attention of the court
to such alleged misconduct, although the court merely
granted him an exception, respondent was entitled to treat
the matter as an adverse ruling.

Exceptions before sentence from the superior court of
Grand Rapids; Stuart, J. Submitted January 17, 1913.
(Docket No. 114.) Decided February 18, 1913.

Anna Huff was convicted of larceny. Reversed.

*Earl F. Phelps*, Prosecuting Attorney, and *Louis T.
Herman*, Assistant Prosecuting Attorney, for the people.

*Edward N. Barnard*, for respondent.

STONE, J. The respondent in this case was charged
jointly with her daughter, Feronia Huff, with the larceny
of a clock of the value of $1, in a store in the daytime.
The evidence on the part of the people tended to show
that the parties were detected, while in the act of the lar-
ceny, by a detective. The respondent was immediately
arrested, and the clock, claimed to have been stolen, to-
gether with some other articles, was found in her pos-
session. The respondent denied her guilt, but upon a
separate trial was convicted, and the case is before us
upon exceptions before sentence.

There are numerous assignments of error, many of them
without merit, and we have referred specifically to such
only as, in our judgment, present meritorious questions.
The following matters are fairly raised upon the record:

Witness William Phillips had testified, on behalf of
respondent, as to her reputation and good character for
some years before. The daughter, Feronia Huff, was
jointly informed against with respondent, but a separate
trial of the latter was had. Upon cross-examination of
the witness Phillips, the following occurred:

"*Q.* Speaking about her reputation, you were down to
police headquarters at the time that the young lady,
Feronia, was picking out the—sorting out—I ask that

now to call your attention to it, when there was a large amount of dry goods store effects piled up there in a room, and Feronia was in there picking out the different things that had been stolen from different places, weren't you?"

This question being objected to, the prosecuting attorney said:

"This witness has testified here as a good character witness, and I am asking the question in regard to that point, and I have asked this question of this witness, if he didn't see that girl and hear her pick out the stuff there that had been brought from her mother's own home.

"*The Court:* The question is proper.

"*Q.* Didn't you see it?

"*Respondent's Attorney:* I think the question is improper. I will ask for an exception.

"*A.* No, sir; I didn't; for I wasn't in the room at the time the lady was there, Miss Feronia Huff.  *  *  *

"*Q.* You do know that a large quantity of stuff was taken out of the house immediately upon this disclosure and returned to the different stores in the city, do you not?

"*A.* No, sir; I don't.

"*Respondent's Attorney:* I object to that; a way to state a lot of things that are not facts, for the purpose of getting them before the jury, which are not true; trying to place them into the witness' mouth, and the witness keep saying ' No,' and the jury hear the questions nevertheless. The questions are not material, any of them; they wouldn't go to show one iota whether this man knew anything about this woman's reputation for truth and veracity in a single instance. I don't believe they are admissible; I object to them.

"*The Court:* If he knew all these things, it seems to me that it would shake his confidence a little in her character.

"*Q.* You did know that there was a good deal of stuff taken from her home, didn't you?

"*A.* Yes, sir; I saw it in the detective's room. The papers claimed that it was stolen from some of the dry goods houses here in the city. I knew they claimed that; but I didn't know that a good deal of that had been identified and returned to the dry goods houses. I didn't talk with the Huffs about that. I didn't know that any of it had been returned. I didn't know that that was what Feronia was doing down there that day that you

and I were there, I didn't know she was picking out the things and telling which house it had been taken from."

Not only was it improper to show the conduct of the co-respondent, Feronia Huff, relating to other goods which the people claimed had been stolen on other occasions (*People* v. *Lyons,* 49 Mich. 78–81 [13 N. W. 365]), but it was error to permit cross-examination as to individual opinions formed or expressed subsequent to the date of the claimed larceny, and after certain things had become known which may have cast suspicion upon respondent. *People* v. *Pyckett,* 99 Mich. 613 (58 N. W. 621).

Upon this subject Wigmore says:

" Where the desired character is that of a party—for example, the defendant in a criminal charge, the prosecutrix in a rape charge, or the plaintiff in a statutory action for seduction,—it is obvious that after the charge has become a matter of public discussion, and partisan feeling on either side has had an opportunity to produce an effect, a false reputation is likely to be created—a reputation based perhaps in part upon rumors about the very act charged, or upon the interested utterances of either party. The safeguards of trustworthiness are here lacking." 2 Wigmore on Evidence, § 1618, citing *Brown* v. *State,* 46 Ala. 175, 184; *White* v. *State,* 111 Ala. 92 (21 South. 330); *White* v. *Commonwealth,* 80 Ky. 485; *People* v. *Brewer,* 27 Mich. 133, 135; *State* v. *Forshner,* 43 N. H. 89, 90 (80 Am. Dec. 132); *State* v. *Sprague,* 64 N. J. Law, 419 (45 Atl. 788); *State* v. *Laxton,* 76 N. C. 216, 218; *Wroe* v. *State,* 20 Ohio St. 472; *State* v. *Taylor,* 57 S. C. 483 (35 S. E. 729, 76 Am. St. Rep. 575); *State* v. *King,* 9 S. D. 628 (70 N. W. 1046); *Lea* v. *State,* 94 Tenn. 495 (29 S. W. 900); *Spurr* v. *United States,* 31 C. C. A. 202, 87 Fed. 701; *Carter* v. *Commonwealth,* 2 Va. Cas. 169.

In *White* v. *Commonwealth, supra,* the court said:

" The only reason for stopping the inquiry at either point [time of discovery or time of arrest] is that the probabilities of innocence arising from previous good character may not be destroyed or embarrassed by the fact that the offense under consideration has been committed.    *    *    * After the discovery that an offense has been committed, a

previous good character may be destroyed and a bad one created by discussion of the circumstances connected with the offense, as well before as after the formal charge of legal proceedings is had."

It is well settled that, when a witness is called to attack or defend character, he can only be asked, on his examination in chief, as to the general character of the person in question; and he will not be allowed to testify as to particular facts, either favorable or unfavorable to such person; but, upon cross-examination, he may then be asked, with a view to test the value of his testimony, as to particular facts. 1 Taylor on Evidence, § 352; 3 Rice on Criminal Evidence, § 375; *State* v. *Merriman*, 34 S. C. 16 (12 S. E. 619).

Evidence, however, of general good character previous to the date of the transaction charged cannot be rebutted by evidence of bad character after the act, and the cross-examination must be confined to acts prior in time to the act charged. *People* v. *Laird*, 102 Mich. 135 (60 N. W. 457), and note.

Ora May Sylvia, another daughter of respondent, was sworn as a witness in her behalf. On her direct examination she had testified that she was at respondent's home, and saw the latter undo various articles and put them back into her pocketbook, and also saw respondent put certain wrapping paper into her pocketbook, which came off from the bundles, presents, bought before Christmas, and described how they were folded up and put back. The people had offered evidence tending to show that certain articles were found in the pocketbook, unwrapped, and that there was folded wrapping paper in the bag at the time of respondent's arrest. This witness had also testified that respondent was intending to send some presents to a sister at Midland.

Upon cross-examination this witness was interrogated as to the articles and wrapping paper, and the following occurred:

"*Q.* You got some Christmas presents up to your moth-

er's house that you gave over to the officers, who took them back to the stores, didn't you?

"*A.* Yes, sir.

"*Respondent's Counsel:* That is under the same objection and exception.

"*Q.* You found out afterwards that this tablecloth that your mother gave you for a Christmas present belonged to one of the stores overtown?

"*A.* Well, I haven't found out yet.

"*Q.* It has been returned, hasn't it?

"*A.* Not that I know of.

"*Q.* That is the way you understand it?

"*A.* Well, I don't know; I don't understand anything about it.

"*Q.* You never made any claim for it, did you?

"*Respondent's Counsel:* The same exception.

"*Q.* When the officers came up and said, 'We want that stuff that your mother gave you for Christmas,' you just handed it right over and said nothing, didn't you?

"*A.* Well, supposing, if you had never been in trouble, a couple of large men would come up and say 'Are you so and so?' tell them 'Yes.' Well, they come in; they come right in the house; they never waited for me to ask them in, or nothing; they come right in; they walk through the kitchen, through the dining room, into the front parlor, front room of the house; and they sit down. I didn't ask them to sit down, and I didn't know what they was going to do. I was alone with my baby, and they came in there, and they said they wanted the Christmas presents that my mother and sister had given me for Christmas. Well, of course, what would any one do but hand them over? They had to. You would do the same if you never had been in trouble yourself. * * *

"*Q.* You handed the presents right over?

"*A.* I told you that I gave them to him.

"*Q.* You have made no claim to them since, have you?

"*A.* No, sir."

In the argument to the jury, the prosecuting attorney, against the objection and exception of respondent's counsel, made the following argument and used the following language when referring to this witness:

"Under the testimony in this case, do you think that that girl got Christmas presents from her mother and

couldn't tell today what she got? If you don't believe that, then how did she get this stuff that she doesn't remember what it was? Why, that is dead easy; that is easy to me; under the testimony she got it as her mother got it, without regard to when or what it was. And when these men came up there to get it she recognized immediately the unlawful possession of it, and the unlawful right to have it given to her, and she just simply says, 'take it, take it, take it,' and they go in there and get whatever they want, and she doesn't know what they took; and she didn't know yesterday what these men had taken out of her house, goods of these storekeepers around town here that she says she got as a Christmas present; and the testimony doesn't support her statement that it was a Christmas present, but it would rather support the theory that she had gotten them at the times, or about the times, when the mother had gotten them, and that she hadn't paid any particular attention to it."

The remarks of the prosecuting attorney, relating to this witness, were unwarranted by the evidence. Witnesses are entitled to respectful consideration; and it is the duty of the court to see that they are protected from the insinuations and attacks of counsel. There was nothing in the evidence to warrant the claim of the prosecutor that this witness was guilty of either larceny or receiving stolen goods, knowing them to have been stolen, and yet she was charged by him with both offenses. The case is fairly within the doctrine stated by us in *People* v. *Lieska*, 161 Mich. 630–638 (126 N. W. 636), and the cases there cited are applicable here.

The people's principal witness in the case was Joseph U. Smith, chief of detectives of the police department of Grand Rapids. His testimony was vital to the people's case, and there was a sharp conflict between his testimony and that of the respondent.

On the argument of the case, the prosecuting attorney went entirely outside of the evidence upon the subject, and used the following language relative to the witness Smith:

"And Mr. Smith, a man of years and years of skill and

practice in his business, as he looks over that store, he sees these two women coming down along there, and skilled in the business, and he has mighty few equals, and we don't know of any superiors, in that branch of the business, detecting people with their countenance and their conduct, and things of that kind."

In our opinion, it was highly improper and reversible error for the prosecuting attorney, in the absence of testimony on the subject, to thus praise and extol the skill and standing of a witness for the people. Juries are apt to consider the prosecuting attorney as unprejudiced and impartial, and statements of fact made by him are apt to have great weight. This court has held that it is improper for the trial court to call attention to the high character of a witness in the charge. *Wisner* v. *Bardwell*, 38 Mich. 278. It is equally improper for the prosecuting attorney to go outside the testimony and make such statements.

It is urged by the people that no ruling was made by the court upon the improper remarks of counsel. The record shows, however, that counsel for the respondent promptly objected to the remarks and called the court's attention to the matter. The court declined to rule, and told respondent's counsel to take an exception.

In *People* v. *Sartori*, 168 Mich., at page 318 (134 N. W. 204), this court said:

"Where, as in this instance, the attention of the court is called to the objection, a ruling requested, and no ruling made, we think the effect of the refusal or failure to rule should be held to be the same as an adverse ruling."

For the errors pointed out, we are constrained to say that the respondent did not have that fair and impartial trial which the Constitution and laws of this State guarantee her. We find no other reversible error in the record.

The conviction is reversed and set aside, and a new trial granted.

STEERE, C. J., and MOORE, McALVAY, BROOKE, OSTRANDER, and BIRD, JJ., concurred. KUHN, J., did not sit.