[Crim. No. 1209.   Fourth Dist.   Mar. 21, 1957.]

THE PEOPLE, Respondent, v. WILLIAM ELMER FARRAR, Appellant.

William Elmer Farrar, in pro. per., and Thomas P. Daly, Jr., under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and George Goffin, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was charged in one count with robbing one W. W. Wright (Bi-Wright Market) on December 20, 1955; in count two with robbery of Wong's (Alta Vista Market) about 5 p. m. on December 20, 1955; in a third count with robbing Frank Greer (White Spot Market) about 6 p. m. on December 27, 1955; in a fourth count with robbing W. J. Reimer (Spick-and-Span Market) on January 19, 1956; and in a fifth count with robbing one W. M. Scott (Sears Market No. 7) on February 1, 1956. All were grocery markets in Bakersfield, and about the same method of robbery was indicated in each charge. It was charged that at the time indicated, defendant was armed with a deadly weapon (an automatic pistol). A trial by jury resulted in a verdict of guilty on counts one and four and not guilty on counts two, three and five. A motion for new trial was denied.

Defendant on this appeal concedes there is a conflict in the evidence as to his presence at the scenes on the evenings charged, but argues that the facts presented bring the case within the "close case rule," and since the district attorney committed prejudicial error in his closing argument, particularly by referring to defendant as "an experienced and pro-

fessional armed robber" and as "an experienced, virtually professional armed robber," such error requires a reversal of the judgment of conviction, citing such authority as *People* v. *Ford,* 89 Cal.App.2d 467 [200 P.2d 867]; *People* v. *Vienne,* 142 Cal.App.2d 172 [297 P.2d 1027]; and *People* v. *Talle,* 111 Cal.App.2d 650, 677 [245 P.2d 633].

As to count one, the evidence shows defendant entered the market at about 5:30 p. m. and started to walk around the end of the counter; that at that time he said to Wright: "Stick it in the bag, the money"; that Wright put the currency, checks and silver ($510) from the cash register in the bag and defendant then said: "Put in your billfold," and Wright hesitated; that before this time defendant had drawn a small black automatic gun and told Wright he would give back the billfold (tooled leather wallet with the initials "W.W.W." containing $211 and other personal papers and checks) but he put it in the bag and walked backwards, facing him for some distance and then departed. Wright described defendant as talking in a low voice and said he was very nervous and wore cheap-looking clothes. He described defendant to the officers as being about 5 foot 11-inches tall, 33 years old, and weighing 175 pounds, and said he appeared to be "an outdoor man" and that there was something peculiar about one of his eyes. He also testified that he was looking defendant in the face all of this time, and in court he positively identified him as the man.

Defendant testified he lived in Shafter, about 18 miles from Bakersfield. Wright's wallet, containing a check made payable to him, together with other papers, was found near the road about 1½ miles from Shafter on March 16, near the place where defendant lived at the time.

A witness who was at the store on the date indicated, after a minute examination of defendant in the courtroom, identified him as follows: He said he met him "face to face," at the door of the market and defendant came "in on the side of him"; that he startled defendant as defendant was leaving the store and that Wright then told the witness to "call the cops"; that he "believed" defendant was the gentleman; and that defendant was the man or "either he is or has a twin brother, one or the other."

As to count two, the evidence shows defendant went into the store, obtained a paper bag, placed three onions in it and went to the check stand; that he held a gun on Wong and told him to put the money in the sack. The defendant said he

would shoot him if he did not do so. Customers were coming into the market. Wong, pretending to obtain another sack for that purpose, called his brother on the telephone extension and defendant backed out to the front end of the store, turned, and left. Wong was not able to tell the type of gun but said defendant spoke in a low voice and appeared to be quite nervous; that he was dirty in appearance and was wearing what looked like an olive green field jacket; that he appeared to be about 40 years of age and that defendant resembled the man but he was not positive of his identification.

As to count three Greer testified defendant walked into the store, came to the check counter and placed a dark-colored automatic gun close to his body and said: "Get over there and give me the money"; and defendant grabbed the currency ($992) which he demanded, and ran out the door; that he spoke in a low voice, had on a dark-colored jacket, a baseball type cap and khaki pants. He described defendant to the officers as being 5 feet 10 inches tall, aged 30 to 35 years, and weighing 165 pounds; and said he was dark complected. His testimony was corroborated by a clerk who saw this occurrence and gave a similar description of defendant and the gun.

As to count four, Reimer testified that about 6:10 p. m. defendant put a bag of lemons on the counter and he noticed he had a small automatic pistol pointed at him and his assistant, and he was ordered to open the cash register and to put the money in a bag; that they did so and were told by defendant to "get to the back" of the store, and as they were doing so defendant ran out the door. They described him as being about 30 years of age, weighing about 170 pounds, and that he wore a black welder's cap with a small beak, and a dark tan checkered sport shirt. A housewife present in the store at the time, described defendant as being "very dominating" with piercing limpid eyes and wearing a welder's cap.

As to count five, Mr. Scott was standing at two cash registers. Defendant walked up and said: "Give me the day's receipts" and stuck a "short, small" gun up close to him and demanded the money ($624) from the two registers, which he gave to defendant. He described the defendant as wearing jeans, a dark shirt, no hat or coat, weighing about 175 pounds; that he was about 5 feet 10 inches tall; and that he spoke in a low voice. He testified in court that defendant was the man he saw that evening.

In defense, defendant's sister testified that defendant arrived at her home in Shafter about 8 p. m. on December 21st;

that he came out here from Texas and took her back there to bring her children to Shafter; that they left that evening and had an automobile accident at Tehachapi; that they returned to Shafter and on December 26th again left for Texas at about 9:30 p. m.; that they arrived there on December 28th, returned to Shafter on January 14, 1957, and thereafter he lived in Shafter in a separate apartment. She claimed that on January 19 she was at his apartment at the time of the robbery and cooked dinner for defendant; that on January 21 they all went to Indiana and returned on January 30th. Defendant corroborated her testimony and testified he came to Shafter via Los Angeles from Texas and arrived in Kern County and Shafter on December 21, about 8 p. m.; that on December 20 he was in Arizona. He claimed he was not present at any of these markets when the claimed robberies took place and never owned a gun. He admitted a previous conviction of a felony (escape from a county jail). He produced certain witnesses who attempted to corroborate his alibi. On rebuttal the prosecution produced a witness who testified that defendant told him on two occasions that he was in El Paso, Texas, on December 20. Although he claimed he had been out of employment and was without funds, except what he borrowed from his sister, he traded cars and paid a $75 differential, bought a television set and took the trips indicated. When making an $8.00 payment due on the television set he paid $20 and told the office manager, on January 14, that he had been working for a pipeline company in Texas and was going around Shafter paying people to whom he owed money.

There is sufficient evidence of defendant's guilt under the counts on which he was convicted and also considerable evidence indicating his participation in the robberies charged in the remaining counts. It does not affirmatively appear that this is a so-called close case. In most instances the identifications were quite positive and the places robbed and method used indicated a particular system in committing the crimes charged. While the Vienne case, *supra*, relied upon by defendant, did condemn the persistent use of the term "professional gunman" in describing the defendant, it was said in that case that there was no evidence so indicating. Likewise, objection was there made to the use of such description and the trial court admonished the prosecution to refrain from using such description. ▮ In the instant case, if the prosecution had established defendant's guilt on all the charges

as indicated by the evidence, his conclusion or deduction that defendant was "an experienced and professional armed robber" or a "virtually professional" one, would not be entirely unfounded. (*People* v. *McKenzie,* 12 Cal.App.2d 614 [55 P.2d 1200].) Assuming that the description of defendant, as made by the prosecutor, should not have been used in the closing argument to the jury, nowhere did defendant's counsel object to its use or ask the trial court to strike it, to admonish the jury to disregard it, or to admonish the prosecution against the use of such description.

■ The general rule is that if the harmful effect of improper statements could probably have been removed by admonition to the jury, failure to request such admonition is regarded as a waiver of the right to rely on the statements as misconduct. Certain exceptions to this rule are noted in *People* v. *Ford, supra,* page 470. ■ Since this is not a conviction on circumstantial evidence or a case that could be considered closely balanced as to defendant's guilt or innocence, it cannot be affirmatively said that any such remarks inflamed the jurors or turned the scales against the accused. Under the circumstances no prejudicial error appears. (*People* v. *O'Moore,* 83 Cal.App.2d 586, 601 [189 P.2d 554] ; *People* v. *Hoyt,* 20 Cal.2d 306, 318 [125 P.2d 29] ; *People* v. *Panagoit,* 25 Cal.App. 158 [143 P. 70] ; 8 Cal.Jur. p. 508, § 521, and cases cited.)

■ The prosecution commented upon the failure of one of defendant's witnesses to testify, which witness may have corroborated defendant's purported alibi. It was pointed out by counsel for defendant that she was not in the State of California at the time of trial. The prosecution then stated, in his closing argument, that he did not know that fact and did not deliberately misrepresent it to the jury, and in effect said that if she was not in the state she could not be compelled to be a witness. No prejudicial error can be based on this occurrence. (*People* v. *Piero,* 79 Cal.App. 357, 360 [249 P. 541] ; *People* v. *Pierson,* 69 Cal.App.2d 285, 296 [159 P.2d 39].)

An examination of the entire record convinces us that no prejudicial error or misconduct was affirmatively shown.

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 15, 1957.