[Crim. No. 6756. Second Dist., Div. Two. June 20, 1960.]

THE PEOPLE, Respondent, v. FRANK L. ADAMS, Appellant.

28

Richard A. Haley for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

FOX, P. J.—Both defendants were convicted of three counts of kidnapping (Pen. Code, § 209) and of two counts of

robbery (Pen. Code, § 211). They appealed from the judgment of conviction and from the order denying their motion for a new trial. On February 10, 1960, this court granted defendant Straw's request to dismiss his appeal. We therefore consider only the appeal of Adams, the remaining appellant.

The record sufficiently supports the following facts: During the early morning hours of August 22, 1958, the Mayfair Market, located at 8725 South Broadway, in the city of Los Angeles, was robbed of a large sum of money. Defendant Adams was observed in the parking lot of the market at about 9:15 p.m., the previous evening (August 21) by Clifford F. Olmstead, a security officer for the Mayfair Market Company. Adams was accompanied by another person whom Olmstead identified as the other defendant, Straw. Olmstead testified that he watched the pair through binoculars and that he was able to closely observe Adams when he later alighted from the vehicle in which he had been seated. At the trial, Olmstead made a positive identification of Adams as the person he observed in the parking lot. He had also noted the license number of the car in which the defendants were seated and it proved to be registered to Adams.

Also, on the evening of the 21st of August, Robert Miller, assistant grocery manager of the Mayfair Market, closed the store at 8 p.m., and proceeded to collect all the cash from the check stands and lock it in a safe in an upstairs office. Alice Louise McKenna and her two children were in the store from about 7:30 p.m., until, in the company of Miller, they left some time after the store was closed. While Mrs. McKenna was waiting for Miller to finish closing the store for the night, she noticed a man who came to the front door. She later identified Adams as the person she saw at the door.

Miller, Mrs. McKenna and her two children left the market and drove to a restaurant in Miller's car. After eating, they drove to Mrs. McKenna's home. As they stopped in front of the house, two men, masked with nylon stockings and armed with revolvers, came upon them from the rear. Miller was forced out of the car at gunpoint and searched for weapons and was then instructed to reenter the vehicle and lie face down on the floor of the rear seat. Before lying down, Miller observed the features of one of the men, who had taken the driver's seat and who had removed his mask. He positively identified Adams as the person he observed.

The man, later identified as Adams, drove the car about a

half block and stopped under a street light. Upon demand, Miller wrote out the combination of the store safe and gave it to the second man, who was riding in the rear seat. The combination was written on a check-cashing courtesy card of Mayfair Markets which Miller had in his pocket. This card was introduced in evidence. After driving several more blocks, Miller again observed the facial features of the driver and at the trial identified Adams as the driver.

The driver returned the car to Mrs. McKenna's house. She and her children were forced into a bedroom where they remained while the following events transpired. Miller was taken into the house, blindfolded and tied with clothes line and made to lie on the floor of the living room. At this time, both assailants were masked. Later the blindfold was removed and Miller was seated in front of a television set which was on and which provided the only illumination in the room. At this time he saw both men without their masks and identified Adams as one of the two men. He was questioned about keys to the market office, and it appeared to him that the assailants knew that an alarm would be activated if the wrong key were used in opening the door. The men obtained the keys, blindfolded Miller, engaged in some conversation and then, after a period of time, Miller heard a horn honk and the house became quiet. After a while, he freed himself of his bonds and telephoned the police.

Woodrow Fleming, a janitor, was engaged in cleaning the Mayfair Market when, at about 2:45 a.m., on the morning of August 22d, he was accosted by an armed man. Fleming identified the man as Adams. Fleming was forced to lie down on the floor while his assailant opened the office door. He was then ordered into the office and told to lie on the floor of an anteroom. When he entered the office, the safe was closed. Later, he heard the buzzer go off and then heard someone run down the stairs. When he next looked, the safe was open.

Over $13,000 was missing from the safe and the check cashing card bearing the combination was found next to the open safe door.

In seeking a reversal Adams argues that the deputy district attorney was guilty of prejudicial misconduct in his argument to the jury: (1) in calling the jury's attention to the fact that witnesses Miller and Mrs. McKenna had taken lie detector tests and by inferring that had they not passed those tests, they would not have been witnesses for the prosecution but would have been principals instead; (2) by referring to facts

not in evidence; and (3) by referring to his prior convictions as proof of the charge of his having robbed the market.

We first consider Adams' argument that reference by the deputy district attorney to the fact Miller and Mrs. McKenna had taken a lie detector test coupled with language strongly suggestive of the fact that they had successfully passed that test, was prejudicial error. The opening argument made by the deputy district attorney was, in part, as follows: "Mrs. McKenna testified to one other factor, that I feel is important. It was brought out by the defense. It was brought out not only as to her testimony, but it was brought out concerning Mr. Miller, and that is that each of these individuals was subjected to a polygraphic examination. That is a lie detector test. It was brought out in this case to cast some aspersions upon them, but under these circumstances, I am quite certain that each of you appreciates the fact that these individuals would be suspects in this case. There is no legitimate investigator in Los Angeles who would not suspect these persons of participating in the offense. But these persons were then subjected to a polygraphic examination and thereafter, they are called in here as witnesses.

"Now, you may ask, or perhaps you may be curious as to why we did not put on evidence as to the results of the polygraphic examination . . . It is just not admissible in evidence . . . That is the answer, clear and simple, but you know one thing. You know one thing for certain. They were subjected to that test. They were interrogated concerning that test, and they are here as witnesses. I am asking you merely to do this. You just have to have some faith in the police officers who represent you, and also in your District Attorney's office. You must have some faith in their interpretation, ——"

MR. HALEY: "Just a moment. The personal thoughts and the personal ideas of the District Attorney are no part of this case, and I ask the Court to admonish the jury."

MR. SNYDER: "I will withdraw the question."

THE COURT: "I didn't think your statement went far, but you have withdrawn it anyway."

The prosecutor, in closing, further argued: ". . . I also mentioned to you when I first spoke to you that you must necessarily have some faith in the Police Department; also in the District Attorney's Office. I made that statement for a particular purpose. I didn't mean to set up the District At-

torney's office or the Police Department as being any gods, that you must necessarily follow what they do or what they may say. I merely brought that to your attention to more or less rebut the inference that Mr. Haley has come up with, this inference that Mr. Haley has of collusion, this inference of a giant conspiracy here on the part of these persons to rob from the Mayfair Market.

"Don't you think Mr. Tidyman who testified from the stand is an experienced police officer? Don't you think that everything Mr. Haley said also came to the attention of this officer and to other officers, and don't you think that these officers interrogated these witnesses and then put them through the ropes, so to speak, in determining whether these persons were principals in this case?

"Mr. Haley by his interpretation and by his argument to you has inferred that what we are using here are accomplices as witnesses and that is a direct attack on the integrity of the District Attorney's Office and also the Police Department."

MR. HALEY: "Again he is ——"

THE COURT: "He is merely answering the argument."

Again, the deputy district attorney said: "Mr. Haley has also gone through the testimony of the various persons, Mr. Miller and Mrs. McKenna. He has gone through their testimony with a view to establish the fact that this was conspiracy.

"As you all recall, Mr. Haley brought out the fact that there was a gun. Mrs. McKenna testified that this particular gun that was in the hands of one of these persons was a snub nose .38. He brought to your attention that Mrs. McKenna's ex-husband had a snub nose .38 revolver, and this was brought to your attention for one purpose. You were to conclude from that that the particular man who entered this market was the ex-husband of Mrs. McKenna. Just how stupid do you think the police officers are? Don't you think they went all through that? Don't you think they interrogated and cross examined these various persons? Do you think they are that stupid? There is no question but what Mrs. McKenna was a suspect at one time. I don't believe there is any question in your mind that these persons took a polygraphic examination as brought out by counsel. I can go no further than that. You must necessarily draw any reasonable inferences that you can from the particular evidence.

"If these persons indicated to the police officer that they could identify the individuals, they could identify one or

more of the persons, don't you think that this question was asked of them at sometime?

"If these persons were suspect, and they were, do you think the police officer would allow them to get the information concerning the license number and the name? . . . Everything done in a courtroom is done for a particular purpose and when I asked the witness, after she took the lie detector test—pardon me, Mr. Miller after he took the lie detector test was he thereafter called as a witness in the case, I did so for a purpose. It is up to you to determine why the questions were asked."

In properly assessing the merit of Adams' contention that the above quoted arguments of the deputy district attorney were of such a prejudicial nature as to require a reversal, several facts must be borne in mind. First, the lie detector tests referred to were not given to Adams, but rather to two prosecution witnesses. Second, the only mention of lie detector tests elicited from the witnesses during the trial occurred during cross-examination of Miller and Mrs. McKenna by Adams' counsel and later by the deputy district attorney on redirect examination of Miller. All of this evidence was received without objection. Third, at no time during the examination of the witnesses was reference made to the results of the tests. And fourth, it is apparent from the record that reference to the fact that the witnesses Miller and Mrs. McKenna had been subjected to lie detector tests was deliberately utilized by Adams' counsel for the purpose of discrediting the testimony of those witnesses.

 Basic to this point is the established rule that the *results* of lie detector tests are not admissible in evidence. (*People* v. *Aragon,* 154 Cal.App.2d 646 [316 P.2d 370]; *People* v. *Parrella,* 158 Cal.App.2d 140 [322 P.2d 83]; *People* v. *Wochnick,* 98 Cal.App.2d 124 [219 P.2d 70]; *People* v. *Schiers,* 160 Cal.App.2d 364 [324 P.2d 981, 329 P.2d 1].) In the Aragon, Wochnick and Schiers cases, evidence of the results of the lie detector tests given to the defendants was introduced. In the Parrella case, no evidence of the result was introduced but there was much testimony and argument concerning the tests given to the defendant.

In both the Schiers and Parrella cases, the error was held to have been cured by the admonition of the jury by the trial court that the lie detector test or the results thereof had no bearing on the case, were not evidence and were to be disre-

garded. In the Aragon and Wochnick cases, the introduction of evidence relative to the results of tests given the respective defendants was held to be reversible error since, in each instance, the evidence directly indicated the guilt of the accused.

Therefore, it is clear that evidence that two *witnesses* had taken lie detector tests, where no evidence relative to the results of those tests was introduced, and where no objection was made to the evidence by the defendant, is not error upon which to predicate a reversal. It cannot be the law that the mere mention of a lie detector test, taken by witnesses without more, is reversible error, even though the jury was not admonished to disregard it. And no doubt, had defense counsel objected to the evidence, the trial court would have instructed the jury that they were to disregard the evidence of the test. But Adams' contention is that the error was committed by the deputy district attorney when he commented upon the lie detector tests in his closing argument. That the comments quoted above constituted misconduct is beyond doubt. It is contended that they were intended merely to rebut the inference raised by the fact that Miller and Mrs. McKenna had taken tests and were therefore at one time suspects in the case. However, the meaning of the language used by the deputy district attorney was unmistakably clear; i.e., that the witnesses had passed the tests else they would not be on the witness stand, and the jury could not reasonably have believed otherwise. Thus, the prosecutor succeeded in getting the results of the lie detector tests before the jury in this indirect manner. But the prosecutor may not be permitted to accomplish by indirection that which he could not accomplish directly. The question remains, whether this misconduct prejudiced Adams so seriously as to require a reversal.

It is contended on behalf of the People that the inference that the witnesses had passed the lie detector test was legitimately to be drawn from the fact that they were not subpoenaed as witnesses until after taking the test. We do not find it necessary to determine this point since the deputy district attorney did not confine himself to this inference. As pointed out by Adams, the prosecutor not only referred to the lie detector tests, but also informed the jury that the witnesses had been investigated and interrogated by the police officers and made it clear that the faith and integrity of the district attorney's office and the police department were pledged in

support of the veracity of the witnesses' testimony. These contentions clearly related to facts not in evidence and to the personal views of the prosecutor. It is thus the cumulative effect of the various arguments of the prosecutor, not only with relation to the lie detector tests but to the veracity of the witnesses as determined by the investigations of the police and the district attorney, which we must examine.

This brings us to a consideration of Adams' second argument which assigns this phase of the prosecutor's argument as constituting prejudicial misconduct. It should be noted that objection to this line of comment was made by defense counsel and at one point the court was requested to admonish the jury. The admonition was refused and the objections overruled.

Comments by the prosecutor on the reputation and credibility of witnesses for the People have been condemned as prejudicial misconduct. (*State* v. *Heaton,* 149 Wash. 452 [271 P. 89]; *People* v. *Huff,* 173 Mich. 620 [139 N.W. 1033]; both cited with approval in *People* v. *Pantages,* 212 Cal. 237 [297 P. 890].) It is unmistakably clear that the comments of the deputy district attorney were intended to and in fact did give credence to the testimony of Miller and Mrs. McKenna on the theory that after having given them the lie detector test, the district attorney, in reliance on the results thereof, concluded that they were trustworthy, and entitled to the confidence of the jury. Not only did the prosecutor use the prestige of his office to assist in establishing the veracity of these witnesses, but also, in this indirect fashion, succeeded in making effective use of the lie detector test for the same purpose. ▮ Moreover, "statements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." (*People* v. *Kirkes,* 39 Cal.2d 719, 724 [249 P.2d 1].) It is argued, however, that the comments of the deputy district attorney regarding the interrogation and investigation of Miller and Mrs. McKenna and the faith and trust which the jury must have in the police and district attorney's office, was justifiable in light of the attack made upon the credibility of the witnesses by defense counsel. But this is not the law. ▮ After an extensive review of the authorities, the court in *People* v. *Kirkes, supra,* at page 725, held that if the remarks of the prosecutor are not warranted by reference to the evidence, the fact that defense counsel had committed a like impropriety would not justify the actions of the prosecutor, and that the only proper way to counter

such abuses is to call them to the attention of the court. See also *People* v. *Sampsell,* 34 Cal.2d 757, 765 [214 P.2d 813].

It was the duty of the trial judge to admonish the jury that they were to disregard the comments of the deputy district attorney insofar as they inferred that he or his office or the police were in possession of evidence leading inescapably to the conclusion that the two witnesses were telling the truth. No such admonition was given. (See *People* v. *Harrington,* 154 Cal.App.2d 857, 860-861 [317 P.2d 161].)

Nor is failure to object to each and every instance of misconduct a waiver of right to object on appeal where it is obvious that an admonition would not cure the defect nor obviate the harmful result. (*People* v. *Kirkes, supra; People* v. *Sampsell, supra.*) Likewise, where the statements are repeated and their cumulative effect is greatly prejudicial to the right of the defendant to a fair and impartial trial, the failure to object at every opportunity is not a bar to consideration of the misconduct on appeal. (*People* v. *Kirkes, supra.*)

It is clear from the record in this case that the damaging force of the prosecutor's remarks would not have been negatived by admonishing the jury to disregard them, but such admonitions would have served to impress more emphatically on the jury the full effect of the prosecutor's argument.

The ultimate question which this court must answer in order to fully comply with the provisions of article VI, section 4½ of the California Constitution is whether or not the misconduct of the prosecutor constituted a "miscarriage of justice." The yardstick which we must use in determining this crucial question as stated by our Supreme Court is whether, after an examination of the whole record, including the evidence, this court is of the " 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) We have concluded, after a thorough review of the record before us, that absent the arguments of the deputy district attorney heretofore quoted, there existed a reasonable probability that as to counts I, II and III, a result more favorable to Adams would have been reached.

Adams was convicted of three counts of kidnapping and two counts of robbery. Two of the kidnapping counts (counts I and II) related to the alleged kidnapping of Miller and Mrs. McKenna. One of the robbery counts (count III)

alleged the theft of Miller's car. As to these three counts, the only substantial evidence was the testimony of Miller and Mrs. McKenna. Therefore, the veracity of these two witnesses was crucial to the prosecution's case. It is reasonably probable that absent the foregoing remarks of the prosecutor the jury would have chosen to disbelieve the testimony of Miller and Mrs. McKenna. The record is replete with contradictions, inconsistencies and conflicts. Under these circumstances, the belief or disbelief of the jury in the honesty and veracity of the two witnesses was a matter of fine balance. That balance was obviously weighted in favor of the prosecution by the comments of the prosecutor which threw the reputations of the police and the district attorney into the scales. If the jury were to disbelieve the two witnesses, it must first come to the belief that the police and district attorney were incompetent in their duties. Obviously, being faced with this decision, any jury would find as this one did, viz., that the witnesses were telling the truth. Conviction on counts I, II and III was then automatic. Thus, in the light of the whole record, the conclusion is inescapable that a "miscarriage of justice" within the meaning of article VI, section 4½ of the California Constitution resulted from the foregoing misconduct of the deputy district attorney.

The convictions on counts IV and V (count IV alleged the kidnapping of the janitor, Woodrow Fleming; count V alleged the robbery of Mayfair Market and from the possession of Fleming) must be sustained. As to these counts the testimony of Olmstead who identified Adams as having been on the parking lot after closing hours and noted the license number of Adams' car, and of Fleming, who positively identified Adams as his assailant and as the person who entered the office where the closed safe was located and fled soon after, leaving an open and nearly empty safe, is ample evidence to sustain the convictions thereon. The fatal comments of the deputy district attorney did not taint this evidence.

Adams also complains of prejudicial misconduct of the deputy district attorney in his references to the prior convictions suffered by Adams, one for burglary and one for attempted robbery. We here consider these contentions in relation to counts IV and V only.

The prosecutor linked these convictions with the testimony of Miller that his assailants seemed to know that the office door could be opened by two keys but that only one key would open the door without setting off the alarm. In this connection

the prosecutor said: ''You look to the fact that he has suffered these two prior convictions. Certainly that would affect his character to some degree. I am not saying the mere fact that he suffered these two prior convictions indicates that he is more likely than not to have committed the particular offenses involved here. He suffered two prior felony convictions, for burglary and the second was an attempted robbery; very serious offenses and you may ask yourself, concerning the keys in this case—we have testimony to the effect by Mr. Miller that the persons apparently knew what they were looking for.

''If you folks have been on this 8th floor for any period of time, if you have heard any commercial burglary cases, you will know that commercial burglars know about the duplicate keys. There is nothing unusual about that. You hear this testimony every week. You hear it about the Ralph's Grocery; you hear it about Vons Grocery; you hear it about various other commercial burglaries and it isn't unusual and a good burglar will know about it.''

Adams correctly points out that proof of prior convictions may be used only to (1) impeach the witness, or (2) to establish intent, guilty knowledge, or a common scheme. That the above quoted language goes beyond the realm of permissible use of such evidence cannot be doubted. However, defense counsel did not object to these statements nor did he request an admonition. Unless an admonition would have been unavailing, Adams is precluded from urging error on appeal. (*People* v. *Hampton,* 47 Cal.2d 239, 240-241 [302 P.2d 300]; *People* v. *Farrar,* 149 Cal.App.2d 362, 367 [308 P.2d 33].) It is clear that under the circumstances, an admonition to the jury to disregard this statement would have completely cured the error. There was strong evidence of Adams' guilt as to counts IV and V which was not dependent upon the inferences and conclusions which the above comments would invoke in the minds of the jurors.

Moreover, the court correctly instructed the jury that the only permissible application of the evidence of prior convictions was for the purposes of impeachment. There is, therefore, no prejudicial error with regard to the comments of the prosecutor on Adams' prior convictions.

The judgment and order are reversed as to counts I, II and III and affirmed as to counts IV and V.

Ashburn, J., and Richards, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.