[Crim. No. 10019. In Bank. Dec. 20, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. DANIEL ALLEN ROBERTS, Defendant and Appellant.

Nancy A. Rossi, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward P. O'Brien, James A. Aiello and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment, after trial before a jury, on verdicts finding defendant guilty of murder in the first degree and imposing the death penalty.

*Facts*: On June 20, 1962, Mr. and Mrs. Popejoy were managers of an apartment building at 1137 Folsom Street in San Francisco. Mr. Popejoy took care of the maintenance of the building, and Mrs. Popejoy collected the rent money and gave receipts therefor.

Mr. Popejoy worked at Bethlehem Steel Company in South San Francisco from 11 p.m. to 7 a.m. He customarily left for work at 10 p.m., and on the night of June 20, 1962, he left at approximately that time.

Upon leaving, he noticed defendant and Mae Coleman, tenants for about three or four months, sitting on the front

steps. As it was against the house rules to sit on the steps, Mr. Popejoy asked them what they were doing there. They replied that they had come out for some air, because it was too hot in their apartment and they could not sleep.

Mr. Popejoy returned from work about 7:15 the following morning and proceeded to check over the building. He then went back into his apartment, had a cup of coffee, and went into the bedroom, intending to retire.

When he saw that his wife was not in the bedroom, he called Kaiser Hospital and the police and then asked some tenants if they had seen her. One of the tenants, Helen Jones, came back with Mr. Popejoy to help him look for his wife, and she found Mrs. Popejoy's body under a bed in the bedroom.

About 7:55 a.m. the same day, Officer Charles Clark, of the San Francisco Police Department, arrived at the Popejoy apartment. After viewing the scene, he removed the spring and mattress from the bed. Underneath the bed, he found Mrs. Popejoy's partially clothed body.

Mr. Popejoy then began checking the apartments, and he noticed that defendant's name had been removed from the mail box assigned to him. All the other names were in place.

He then ascertained that defendant and Mae Coleman had left their apartment. At this time he discovered that his watch was missing, as well as the rental agreements, the rent receipt book, and his wife's wallet.

The autopsy surgeon testified that Mrs. Popejoy's death was due to strangulation; that there were a number of abrasions on the left side of her neck; and that completely encircling the neck was an indentation, which was probably caused by the use of a cord of some type.

Another tenant, Mr. McKinley Brown, testified that on the evening of June 20, 1962, about 10:30 p.m., he went to the garbage bin area on the first floor; that when he opened the door, he observed defendant looking at the *Chronicle* green sheet; that he disposed of his trash and left the room to return to his apartment; that defendant followed him as far as the door to the Popejoy apartment, where he stopped and knocked; that he heard Mrs. Popejoy cry out, "What do you want at this time of night?"; that defendant replied that he wanted to pay his rent; that Mrs. Popejoy opened her door; and that defendant entered her apartment.

Mae Coleman testified, as follows:

She was living with defendant on June 20, 1962, and had known him about six months prior thereto. On June 20, 1962,

defendant went to his job as a caddy and, as was his custom, locked her in the apartment, telling her not to go out.

When he returned from work that afternoon, he discussed robbing the landlady of the money which he thought she kept in her apartment. He though the money was kept in a desk. Later, around 6:30, defendant's brother, Charles Roberts, came to the apartment, and the three of them sat around drinking wine.

Defendant began hitting the palm of his hand with his fist, saying, "Four more hours." His brother asked him what he meant by that, and he replied that he was planning to rob a garment factory nearby. He then gave his brother some clothes to take to his apartment, indicating that he would go there after he had committed the robbery.

After Charles left, defendant told Mae that he had told his brother he was going to rob a garment factory, because he did not want to get his baby brother in trouble.

He told her, also, that he would tear up the *Chronicle* green sheet into pieces approximately the size of money and gain entrance to the Popejoy apartment by telling Mrs. Popejoy that he had come to pay his rent.

They went down to sit on the front steps to make sure Mr. Popejoy went to work that night.

After Mr. Popejoy left for work around 10 or 10:30 p.m., they went back to their apartment, where defendant instructed her to pack everything, because they would be leaving in a hurry when he came back.

He left the apartment, taking her head scarf with him, saying that it would help her (Mrs. Popejoy) talk. She waited for his return for half an hour or so, and when he did not come back within that time, she went to sleep.

When she awoke, defendant had returned. He asked her to come downstairs with him to help search for the money. Defendant did not appear to be intoxicated, even though he had drunk some wine.

Defendant took her down the back stairs and into the Popejoy apartment by the kitchen door. When she noticed that Mrs. Popejoy was not there, she asked defendant where Mrs. Popejoy was. He told her to mind her own business and to look for the money.

They searched all three rooms of the apartment without success. She searched the bedroom, but did not see anybody. When she started for the bed, defendant said, "Never mind that," adding that he had looked there. Failing to find any

money, they took Mr. Popejoy's watch, Mrs. Popejoy's wallet, the rental agreements, and the rent receipt book. They left by the kitchen door. Before leaving, defendant dusted around the furniture to make sure there were no fingerprints left behind.

They went back to the apartment, where defendant finished packing, and she, in order to throw the police off their trail, wrote a four-page note to defendant saying she was leaving him and returning to Santa Barbara. Defendant also put an electrical cord into her handbag.

They left the apartment building through the front entrance and walked a few blocks to a bus stop. At the bus stop, defendant took the head scarf out of his pocket and put it in a garbage can next to a building. The scarf had blood on it. Defendant told her that he thought he had "hit her [Mrs. Popejoy] too hard." He said that he had to hit her, because she said, "What if I scream?" and he told her, "Go ahead."

They then went to his brother's apartment, where defendant stated that he had hit Mrs. Popejoy too hard. She then stated to him, "Well, maybe it is better off that the old bag is dead, that way she won't be able to identify you."

She further testified that the first time she knew that Mrs. Popejoy was dead was when she and defendant were in Sacramento, and she saw a newspaper story relating to the murder of Mrs. Popejoy.

*Questions*: First. *Was the prosecuting attorney guilty of misconduct?*

*No.* Both defendant and Mae Coleman were charged with the murder of Mrs. Popejoy. Just prior to the time the case came on for trial for the third time, however, the prosecuting attorney moved under section 1099 of the Penal Code to dismiss the charges against Mae Coleman and to call her as a People's witness.

Defendant's argument on this appeal is that ". . . the dismissal of Mae Coleman and the subsequent attempt to build up her character and credibility while unfairly attacking the credibility of the defendant constitutes sufficient prejudicial error to have denied the defendant a fair trial under the mandate of both the state and federal constitutions." He does not contend that the verdict is unsupported by the evidence.

Section 1099 of the Penal Code provides: "When two or more defendants are included in the same accusatory pleading, the court may, at any time before the defendants have gone into their defense, on the application of the prosecuting

attorney, direct any defendant to be discharged, that he may be a witness for the people."

It has been repeatedly held that pursuant to this section dismissing the charges as to one defendant, so that he may be a witness for the State, is proper and that it is not misconduct for the prosecuting attorney to avail himself of the provisions of the statute. (*People* v. *Terry*, 57 Cal.2d 538, 559-560 [21 Cal.Rptr. 185, 370 P.2d 985] ; *People* v. *Griffin*, 98 Cal. App.2d 1, 49-50 [26] [219 P.2d 519] ; *People* v. *Chapman*, 91 Cal.App.2d 854, 857 [3] [206 P.2d 4].)

In *People* v. *Alverson*, 60 Cal.2d 803 [36 Cal.Rptr. 479, 388 P.2d 711], the prosecuting attorney, during his closing argument, asked for the acquittal of a codefendant, who had identified the other two defendants as the perpetrators of the crime. We held this action to constitute prejudicial misconduct (p. 808 [2]) and pointed out several alternatives that were available to the prosecuting attorney, one of them being the procedure prescribed by section 1099 of the Penal Code (p. 806).

With respect to the prosecuting attorney's efforts to "build up her [Mae Coleman's] character and credibility," the record shows that in his closing argument to the jury he said: "She [Mae Coleman] can't possibly be tried under the law, and this is important in considering her testimony. . . .

"She couldn't be prosecuted again. I could offer her no promise. Her testimony wasn't conditioned upon some promise. The promise had already been executed; she was dismissed before she testified, and this is extremely important in this case.

"She had nothing to gain by testifying against Dan Roberts, other than as she told you, in effect, to clear her conscience so that she could start living to see how the other side lived."

Thereafter, defense counsel in her argument stated: "I purposely refrained from interrupting in any way the examination by Mr. Shaw [prosecuting attorney] of Mae Coleman. She was able under his direction to recite what her testimony had been prepared to be."

In his reply, the prosecuting attorney said: "Mrs. Rossi [defense counsel] accuses Mae—and I take this very gravely—'She was able,' meaning Mae, 'under his direction,' meaning mine, 'to recite what her testimony had been prepared to be,' and that's 'from her argument.'

"That's shocking. She is accusing me of directing her to recite her testimony. Well, you heard her testimony and you

heard the way it came out. She had an opportunity to tell what happened and she told it. It is common practice to take on the District Attorney if you have nothing else to talk about.

". . . . . . . . . . .

"Now, it is a curious thing how she [Mae Coleman] even mentions how the deputies upstairs were good enough to give her clothes, and the Ertolas brought her some [Mr. Ertola was Mae Coleman's attorney], and this morning Mrs. Rossi wants you to think she is lying. Now, it was brought out for the first time—I didn't bring it out, Mrs. Rossi brought it out on cross-examination of Mae, the first time she asked Mae where she was living.

"Mae gave the address. She didn't mention Mr. Ertola's name. She [Mrs. Rossi] said, 'With whom do you live at that address?' And she [Mae Coleman] finally said, 'Yes, I live with Mr. Ertola.'

"And it developed that she was there with his wife, his children, given a home by Mr. Ertola, that he is going to get her an education.

"Now, Mrs. Rossi accuses Mae Coleman apparently—she is never quite clear on it—of murdering Mrs. Popejoy, and of lying when she implicates Dan Roberts. I suppose she wants you to believe that Mr. Ertola perhaps is a party to this since he is the one who has been advising her upstairs for a couple of years, a person who has taken her—a woman Mrs. Rossi wants you to believe who murdered Mrs. Popejoy—into his home with his wife and children."

■ Remarks made by a prosecuting attorney are within the scope of permissible argument if they are based upon a reasonable interpretation of the evidence, it being settled that a prosecuting attorney may argue any matter helpful to his case, provided he confines himself to the record and those inferences which may reasonably be drawn therefrom. (*People* v. *Atchley,* 53 Cal.2d 160, 174 [14] [346 P.2d 764] ; *People* v. *Purvis,* 52 Cal.2d 871, 880 [3] [346 P.2d 22].)

■ Although it is improper for a prosecuting attorney to express his personal belief as to the reliability of a witness, he may comment upon the credibility of a witness " 'in the light of all the evidence in the case.' " (*People* v. *Perez,* 58 Cal.2d 229, 245 [15] [23 Cal.Rptr. 569, 373 P.2d 617].) In the present case, the prosecuting attorney's remarks were within the permissible scope.

■ The record shows that the charges against Mae Coleman were dismissed before defendant's trial began. Accord-

ingly, it was entirely proper for the prosecuting attorney to comment that as a result she had nothing to gain by testifying against defendant except to clear her conscience. (Cf. *People v. Rosoto*, 58 Cal.2d 304, 364 [72] [23 Cal.Rptr. 779, 373 P.2d 867].)

▌ As indicated above, after counsel for defendant in her argument to the jury accused the prosecuting attorney of telling Mae Coleman how she should testify, the prosecuting attorney referred to the fact. that Mr. Ertola, Mae Coleman's attorney, had taken her into his home with his wife and children. The clear implication was that Mr. Ertola would not have done so if he had not been convinced she was a woman of good character and worthy of belief.

The fact that Mae Coleman was staying in the home of her attorney with his family was in the evidence, having been brought out by defendant's counsel on the cross-examination of Mae. Coleman. The prosecuting attorney's statements hereinabove quoted merely recited facts in evidence and reasonable inferences therefrom. Under the circumstances, his remarks were a permissible response to the argument of defendant's counsel.

None of the cases cited by defendant support the arguments which he makes. Only three of them concern misconduct, and not one refers to misconduct because of an application to dismiss the charges against a codefendant.

. The three cases dealing with misconduct, *Berger v. United States*, 295 U.S. 78 [79 L.Ed. 1314, 55 S.Ct. 629], *People v. Adams*, 182 Cal.App.2d 27 [5 Cal.Rptr. 795], and *People v. Talle*, 111 Cal.App.2d 650 [245 P.2d 633], all have factual situations completely dissimilar to the facts of this case and are inapplicable here.

*Berger* involved pronounced and persistent misconduct by a United States Attorney, in that he constantly misstated the facts while cross-examining defense witnesses, bullied them, and made improper insinuations and assertions purposely calculated to mislead the jury.

The prosecutor in *Talle* was similarly malfeasant, in that he was degrading towards defense witnesses, appealed constantly to the prejudice and bias of the jury, and stated that anyone who would employ a certain San Francisco attorney who was serving as one of the defendant's counsel must be guilty. In addition, he invited the jury to come to his office when the case was over to see the great amount of work done on the case

and said he knew the defendant was guilty, adding "God knows that Talle is guilty."

In *Adams,* the prosecuting attorney told the jury that two of the People's witnesses (who had been suspects in the case) had taken lie detector tests, and argued that they must have passed the tests, since otherwise they would be standing charged with the offense. In this way, he used the prestige of his office to assist in establishing the veracity of the witnesses and succeeded in making effective use of the lie detector tests, the results of which were inadmissible in evidence, for the same purpose.

■ Second. *Did the impeachment by proof of a prior felony conviction deprive defendant of a fair trial?*

*No.* Defendant argues that impeachment by proving a prior felony violates the due process clause of the Fourteenth Amendment and "the companion guaranty at the state level." This argument, however, is without merit.

In *People* v. *Pike,* 58 Cal.2d 70, 93 [25] [22 Cal.Rptr. 664, 372 P.2d 656], it was stated: "A defendant who chooses to take the witness stand in a criminal action thereby subjects himself to impeachment in the same manner as any other witness, including impeachment by proof of a prior felony conviction. The rule is not different where the defendant has admitted the prior conviction out of the presence of the jury in pleading to the indictment or information, notwithstanding the provisions of section 1025 of the Penal Code." (See also Code Civ. Proc., § 2051; *People* v. *Jackson,* 53 Cal.2d 89, 93 [3] [346 P.2d 389]; *People* v. *Terry, supra,* 57 Cal.2d 538, 563 [21]; *People* v. *Stone,* 239 Cal.App.2d 14, 18-19 [48 Cal. Rptr. 469].)

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., Schauer, J.,* and Peek, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.