Filed 7/14/14  P. v. Lewis CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B241236 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA117431) |
| v. | |
| VINCE E. LEWIS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Ricardo R. Ocampo, Judge.  Judgments affirmed.

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant Vince Lewis.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant Ariana Coronel.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant Mirian Herrera.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendants Herrera, Lewis and Coronel of first degree murder and found that Herrera personally discharged a firearm in its commission. The court sentenced each defendant to 25 years to life for the murder and sentenced Herrera to a consecutive 25 years to life for the personal firearm use. We affirm the judgments.

## FACTS AND PROCEEDINGS BELOW

The victim, Darsy Noriega ("Mickey"), and all three defendants, Vince Lewis ("Shady"), Ariana Coronel ("Temper") and Mirian Herrera ("Loca") are members of the Easy Riders gang. The Easy Riders are enemies of the Dead End Harpees.

On January 31, 2011, Coronel sent a text message to an unidentified recipient that stated in relevant part: "[W]e [are] kicking [Mickey] out the hood cuz [S]ilent[1] told me a HPS[2] in jail said she was fucking one of [th]em."

On February 2, 2011, Coronel sent several text messages to several unidentified recipients. The first message stated: "Homies from [that] ERS[3] gang mando hood meeting tonight at 10 pm. Shady is calling it." The second message, seven minutes later, read: "Mickey getting the boot." The third message stated: "We're gonna take Mickey outta the hood[.] Don't say anything[.] We don't want to scare her." Coronel's next message read: "At [10] pm Mickey is getting the boot[.] [T]hey [are] waiting for me to get out of work to do this." Coronel's final message before the meeting stated: "Mickey is getting the boot out the hood."

Although the recipients of Coronel's messages were not identified at trial, the jury could infer from the contents of the messages that the recipients were other gang members or persons interested in the gang's activities.

Amy Aleman was a defendant in the case until she negotiated a plea to voluntary manslaughter and a four-year sentence. She testified for the prosecution at the trial of Lewis, Herrera and Coronel.

---

**1**     Presumably a gang moniker.

**2**     Presumably Harpees.

**3**     Presumably Easy Riders.

Aleman told the jury that on the night of the murder she attended a meeting of the Easy Riders. Lewis and three female members, Herrera, Coronel and Noriega were present along with other gang members. She knew that Noriega was going to receive a "violation" which she described as "a physical beating" and testified that "people always walk away from violations."

According to Aleman, at some point during the meeting Lewis told her, Noriega, Herrera and Coronel to come with him to buy beer. The group went to a liquor store where Lewis and Coronel bought the beer. After the group left the store, Herrera, who was eight months pregnant, said she needed to urinate. Lewis did not head back to the house where the meeting was taking place, which was only a few minutes away. Instead he drove around looking for a private spot and eventually parked on a street next to an alley. Herrera, Aleman and Noriega got out of the car. Coronel and Lewis remained inside. The three women walked down the alley. Aleman was in the lead. Herrera and Noriega were walking behind her.

As Aleman was walking down the alley she heard gun shots behind her. She turned around and saw Herrera shooting Noriega. Aleman estimated there were "a lot" of shots, "probably like seven." She ran back down the alley past Herrera and Noriega's body and got into Lewis's car. Herrera also ran to the car and got in. Lewis drove back to the place of the meeting. Upon their return Herrera told Aleman, "It had to be done. Mickey was in other hoods."

One of the Easy Riders drove Aleman home after the meeting. He told Aleman to get rid of her clothes because they might contain gun powder residue. Aleman put her clothes in a plastic bag and either Lewis or Coronel stuffed them down a storm drain. The police recovered the clothes based on information Aleman supplied them with.

Responding to a call from a neighbor, the police found Noriega's body in the alley shortly after the shooting. Noriega died from multiple gun shot wounds. The pathologist who examined her body estimated she was hit by approximately 10 bullets which struck

3

her throat, left abdomen, left arm and mid-lower back.  A forensic examination found that all the bullets were fired from the same semi-automatic handgun.

The day after the murder, Coronel sent text messages to a person identified as Adriana describing Noriega's murder.  Coronel stated in part:  "Hey, Mickey is dead. . . . Like we took her last breath dead. . . . Yeah she[']s dead[.]  [W]e didn't rush her or nothing[.]  [W]e just gave it to her. . . . The potbellied/pregnant one [Herrera] and the other who is barely pregnant [Aleman] got out with the RIP to supposedly take a piss in the alleyway near 111th St. . . . I stayed in the car with [Lewis] because obviously me and the RIP . . . don't get along so the RIP would have smelt it. . . . And the potbellied/pregnant girl go[t] the nine and shot her all over her body.  Then from there they got into the car and we got the fuck out of there. . . . I wanted to do it but it w[as] gonna b[e] to[o] ob[v]ious [and] she felt comfortable with both of [th]em so it w[as] [c]ool."

Coronel had another text conversation with an unknown person later that day. The conversation went as follows, beginning with the unknown texter.  "So how did it go yesterday?"  "Good. . . . She[']s gone."  "But did you guys hit her?"  "Yup[.] [S]he[']s dead."

In some of her text messages after the murder, Coronel told the recipients, "Erase the t[e]xt," "[e]rase the text pl[ease]" and "[j]ust don't say anything."

The following month police arrested an Easy Rider gang member, Gilbert Mendoza, on a probation violation.  Mendoza told the police that he had information about Noriega's murder.  When Mendoza took the stand under a grant of immunity, he swore he could not recall anything that happened at the meeting or anything he told the police.  He did testify, however, that there is a difference between a "violation" and "getting taken out of the hood."  "You can walk away" from a violation, Mendoza explained, but if you're "taken out of the hood," you don't walk away from that.

Mendoza's recorded statement to the police was played to the jury.[4]

Mendoza stated that on the night of the murder he was at a meeting of the gang called by Lewis. The purpose of the meeting was to discipline Noriega for violating the gang's rules against fraternizing with rival gang members. "I knew that Mickey was going to get a violation," Mendoza told the police. Mendoza gave varying descriptions of a "violation." At one point he agreed with the interviewer that "a violation is essentially a physical beating"; that they are "common"; and that "people get violated all the time" and "walk away." Later, however, Mendoza said that a violation could involve a shooting or a stabbing. Mendoza said that at the meeting he asked Aleman if "the guys" were going to participate in carrying out the violation. Aleman told him, "Nah. This is just for the females."

He also stated that during the meeting Lewis said he and the women were going out to buy beer. Mendoza observed that the gang had beer there. Lewis and the women were gone 30 or 40 minutes and returned to the meeting without Noriega. No one commented on her absence.

When the meeting broke up, Mendoza was with the group that dropped off Aleman. He said that one of the gang members told her to change her clothes and give them to him because they might have gunpowder on them. The police found Aleman's clothes at the location Mendoza named.

Winston Lee, a Los Angeles police officer, testified as the prosecution's gang expert. Lee stated that in general a gang meeting is required to decide whether a member needs to be disciplined and only one person in the gang, the "shot caller," can call such a meeting. Lee testified that the Easy Riders have only one "shot caller" but he was not asked, and did not volunteer, that person's name. Lee further testified that within a gang it's "a big problem" if a member is socializing with a member of a rival gang. According to Lee, "A person who socializes with a rival gang member, usually [ends] up either

---

[4]    A trial witness's deliberately evasive forgetfulness authorizes admission of the witness's prior inconsistent statements under Evidence Code section 1235. (*People v. Perez* (2000) 82 Cal.App.4th 760, 764.

being beaten to the point of death or killed" depending on whether the gang considers the violation a minor one or a major one. The more serious the violation, the more times the violator will be shot.

Lee also testified that based on his experience it was his opinion that Noriega's murder was committed for the benefit of the Easy Riders. He admitted, however, that he had never before heard of the Easy Riders killing one of its own members.

A jury found Lewis, Herrera and Coronel guilty of first degree murder and found that they committed the murder for the benefit of the Easy Riders gang. The jury also found that Herrera personally and intentionally discharged a firearm causing death. The court sentenced Lewis and Coronel to 25 years to life in state prison. It sentenced Herrera to 25 years to life on the murder charge and a consecutive 25 years to life for the gun use enhancement. (Pen. Code, § 12022.53, subd. (d).) The court did not impose sentence on the gang enhancements because, it reasoned, the punishment of a 15-year minimum for parole eligibility for the gang enhancement (Pen. Code, § 186.22, subd. (b)(5)) is superseded by the defendants' 25-year minimum for parole eligibility for the gun enhancement. (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 39, fn. 6.)[5]

## DISCUSSION

### I. THE COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO SEVER THE DEFENDANTS' TRIALS.

The court denied the motions by Herrera and Lewis to sever their trials from each other's and from Coronel's. We review that ruling for abuse of discretion. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41.)

As a general rule, "[w]hen two or more defendants are jointly charged with any public offense . . . they must be tried jointly, unless the court orders separate trials." (Pen. Code, § 1098.) The court may order separate trials "in the face of an incriminating

---

[5]     For this reason, we need not address Lewis's claim that there was insufficient evidence to support the gang enhancement. Lewis concedes that any such error was harmless.

confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People v. Massie* (1967) 66 Cal.2d 899, 917.) The court may also order separate trials where a joint trial would compromise a specific trial right of one of the codefendants or prevent the jury from reaching a reliable verdict. (*People v. Coffman and Marlow*, *supra,* 34 Cal.4th at p. 40, fns. omitted.) The kind of prejudicial evidence that may require severance is evidence against a codefendant that is likely to inflame the jury against the defendant or is evidence in a strong case against a codefendant that may spill over and bolster a weak case against the defendant. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030.)

No exception to the general rule applies here. Defendants who are charged with a common crime involving common events and a common victim in which the evidence is cross-admissible against all the defendants present a classic case for a joint trial. (*People v. Coffman and Marlow*, *supra,* 34 Cal.4th at p. 40; see *People v. Kraft*, *supra*, 23 Cal.4th at p. 1030.)

Herrera and Lewis argue Coronel's text messages were not cross-admissible insofar as the messages linked them to Noriega's murder. (See pp. 2 & 4, *ante*.) As we explain below, Coronel's text messages were admissible against Herrera and Lewis because the texts were trustworthy and relevant to their liability for Noriega's murder. "If the evidence in each case is shown to be cross-admissible in the others, ordinarily any inference of prejudice from joinder of charges is dispelled." (*People v. Sully* (1991) 53 Cal.3d 1195, 1222.) Thus, the admissibility of evidence that merely links a defendant and a codefendant to a common crime does not require severing the defendants' trials.

7

**II. THE TESTIMONY OF ALEMAN AND THE STATEMENTS OF MENDOZA AND CORONEL WERE PROPERLY CONSIDERED BY THE JURY.**

Defendants Lewis and Herrera contend that their convictions must be reversed under the rule that the testimony of an accomplice must be corroborated by independent evidence. (Pen. Code, § 1111; CALCRIM Nos. 334 & 335.)[6] Lewis and Herrera maintain that their convictions depended upon the uncorroborated testimony of three alleged accomplices, Aleman, Mendoza and Coronel.

The trial court instructed the jury that if the evidence showed a murder was committed then Aleman was an accomplice to that murder as a matter of law. The court instructed the jury to decide from the evidence whether, if a murder was committed, Mendoza was an accomplice to that crime. The court further instructed the jury that it could not convict the defendants based on the testimony of an accomplice unless that testimony was corroborated by independent evidence tending to connect the defendants to the commission of the crime.[7]

We conclude that the evidence does not support a finding that Mendoza was an accomplice in the murder of Noriega and therefore the jury could consider his testimony without evidence to corroborate it. We further conclude that there was sufficient corroborating evidence of Aleman's testimony.

---

[6] Under Penal Code section 1111, "A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." For purposes of this rule, Mendoza's and Coronel's out-of-court statements are considered "testimony" when they are used as substantive evidence of guilt. (*People v. Williams* (1997) 16 Cal.4th 153, 245).)

[7] The court did not give the jury a corroboration instruction with respect to Coronel's text messages. No such instruction was required for the reasons we discuss in Part IV, *post*.

**A.    The Evidence Did Not Support A Finding That Mendoza Was An Accomplice In The Noriega Murder.  Therefore His Statements Did Not Require Corroboration To Be Admissible.**

An accomplice is defined in Penal Code section 1111 as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  (Pen. Code, § 1111.)  "An aider and abettor is chargeable as a principal, but his liability as such depends on whether he promotes, encourages, or assists the perpetrator and *shares* the perpetrator's criminal purpose. . . . It is not sufficient that he merely gives assistance with knowledge of the perpetrator's criminal purpose."  (*People v. Sully*, *supra*, 53 Cal.3d at p. 1227.)  A defendant has the burden of proving by a preponderance of the evidence that a prosecution witness is an accomplice.  (*Id.* at p. 1228.)  The evidence does not support an inference of accomplice liability on Mendoza's part.

Mendoza's admission that he went to the gang meeting knowing that Noriega was going to get a "violation" does not make him liable for her murder as an aider and abettor or coconspirator.  Mere knowledge of a crime or failure to attempt to prevent it is not enough to make a person an accomplice.  (*People v. Moran* (1974) 39 Cal.App.3d 398, 413; see *People v. Sully*, *supra,* 53 Cal.3d at p. 1227.)  There was no evidence that Mendoza assisted in planning the attack on Noriega or in carrying it out.  Furthermore, defendants have cited no case holding that one whose offer to commit a crime is rejected may nevertheless be held to be a principal solely on the basis of making the offer.

**B.    Aleman's Accomplice Testimony Was Independently Corroborated By Mendoza, The Gang Expert, The Police Investigation And The Forensic Examiner.**

Penal Code section 1111 states that a conviction cannot be based on an accomplice's testimony unless "other evidence as shall tend to connect the defendant with the commission of the offense."  "The corroboration required of accomplice testimony . . .  need only connect the defendant to the crime sufficiently that we may conclude the jury reasonably could have been satisfied that the accomplice was telling the truth."  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 185-186.)  "[T]he

9

corroborating evidence may be circumstantial, of little weight by itself, and related merely to one part of the accomplice's testimony." (*Id*. at p. 186.) The connection to the defendant must be shown "without aid or assistance from the accomplice's testimony." (*People v. Avila* (2006) 38 Cal.4th 491, 563.)

It has long been understood that the testimony of one accomplice cannot corroborate the testimony of another. (*People v. Fauber* (1992) 2 Cal.4th 792, 834; see CALCRIM Nos. 334 and 335 ["The evidence needed to support the (statement/[or] testimony) of one accomplice cannot be provided by the (statement/[or] testimony) of another accomplice"].)

After the prosecution rested, Lewis and Herrera moved to dismiss the case on the ground that Aleman and Mendoza were accomplices in the murder of Noriega and their testimony lacked corroboration from a source other than Coronel, an accomplice. The trial court denied the defendants' motions on the ground that there was sufficient evidence apart from Coronel's text messages to corroborate Aleman's and Mendoza's testimony. We agree.[8]

Aleman's testimony was sufficiently corroborated by Mendoza and the gang expert.

Mendoza's statement corroborated Aleman's testimony that Lewis called a meeting of the gang to physically punish Noriega for fraternizing with a member of a rival gang. His statement served as independent evidence that the women in the gang (Herrera, Coronel and Aleman) were going to be the ones who administered the punishment. It also served as independent evidence that Lewis's directing Noriega and the other women to come with him to buy beer (when there was already beer on hand) was a ruse to get Noriega to a place where she could be killed. Officer Lee's testimony supported an inference that Lewis was the Easy Riders' "shot caller" and that Lewis

---

**8**    We have  earlier concluded that the evidence did not support a finding that Mendoza was an accomplice and therefore his statements could be admitted against Lewis and Herrera without corroboration. (See p. 9, *ante*.)

10

intended that Noriega be murdered for violating the gang's edict against socializing with rival gang members.

Given corroboration of Aleman's testimony of defendants connection to the murder, her entire testimony was properly before the jury, including that she saw Herrera shooting Noriega in the alley and that after the murder, Herrera told her: "[I]t had to be done."

### III. CORONEL'S TEXT MESSAGES WERE ADMISSIBLE AGAINST LEWIS AND HERRERA UNDER THE HEARSAY EXCEPTION FOR STATEMENTS AGAINST PENAL INTEREST.

Lewis and Herrera argue that the court erred in admitting the portions of Coronel's text messages that implicated them in Noriega's murder because the texts did not fall within the hearsay exception for statements against the declarant's penal interest.[9] In particular, defendants claim that the portions of Coronel's texts that implicate them were not "specifically disserving" of Coronel's penal interest. (*People v. Valdez* (2012) 55 Cal.4th 82, 144.) We disagree.[10]

The statements at issue are Coronel's pre-murder texts which informed members of the Easy Riders that Lewis had called a mandatory meeting to "boot" Noriega "out the hood" and that the gang are "waiting for me to get out of work to do this" and her post-murder texts in which she informed the recipients "we took [Noriega's] last breath," that Herrera "shot her all over her body" and that "I wanted to do it but it w[as]

---

[9] Evidence Code section 1230 states in relevant part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made . . . so far subjected [the declarant] to the risk of . . . criminal liability . . . that a [person] in [the declarant's] position would not have made the statement unless [the person] believed it to be true."

[10] Out-of-court statements to a friend or associate inculpating the defendant and a codefendant are not "testimonial" and their admission does not violate the confrontation clause. (Cf. *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1397.) Defendants do not raise a confrontation clause argument.

11

gonna b[e] to[o] ob[v]ious [and] she felt comfortable with both of [th]em so it w[as] [c]ool."

Coronel's pre-murder texts are declarations against her penal interest because they admitted her role as an aider and abettor in the plan to "boot" Noriega "out the hood" which, according to the testimony of Mendoza and Officer Lee, meant at the least that Noriega would receive a severe beating, i.e. an assault with force likely to produce great bodily injury, and that she might even be killed. Her post-murder texts were likewise against her penal interest in that they admitted her participation in the murder. "Not all statements which implicate the declarant are admissible against the nondeclarant," however. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 328.) Whether Coronel's text messages can be used against Lewis and Herrera requires further analysis.

"Only those statements or portions of statements that are specifically disserving of the penal interest of the declarant [are] deemed sufficiently trustworthy to be admissible." (*People v. Greenberger*, *supra*, 58 Cal.App.4th at p. 328.) Of course, a statement may inculpate the nondeclarant and the declarant and thus be "specifically disserving" of the defendant's penal interest. (*Id*. at p. 335.) Such a determination requires an analysis of the trustworthiness of the statement inculpating the nondeclarant. This in turn requires careful consideration of what was said and the totality of the circumstances. (*Ibid*.)

The determination of whether a statement is trustworthy rests with the sound discretion of the trial court. A reviewing court may overturn the trial court's determination only if that discretion was abused. (*People v. Frierson* (1991) 53 Cal.3d 730, 745.)

We agree with the trial court's ruling that Coronel's pre-murder text messages were admissible against Lewis. The references to Lewis were an integral part of the messages because, as Officer Lee explained, only the gang's shot caller can call a meeting of the gang. Coronel's messages do not attempt to shift the blame for the attack on Noriega to others or to reduce Coronel's own culpability for the crime. To the contrary, the texts show that Coronel is reveling in the upcoming action against Noriega

12

and is eager to participate ("[t]hey [are] waiting for me to get out of work to do this"). Moreover, Coronel's statement that Lewis called the meeting is supported by the testimony of Mendoza and Aleman.

The post-murder messages were likewise admissible against Herrera. Similar to the pre-murder messages, Coronel's post-murder messages have "particularized guarantees of trustworthiness." (*Lilly v. Virginia* (1999) 527 U.S. 116, 136-137.) In *Lilly*, the plurality opinion stated that in determining whether a declaration contains particular guarantees of trustworthiness, courts should look to the surrounding circumstances, including the language used by the declarant, and the setting in which the statement was made. (*Id*. at p. 139.) Here Coronel made her statements voluntarily in a noncustodial setting and for the private use of her audience. As the court observed in *Greenberger*, "[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*People v. Greenberger*, *supra,* 58 Cal.App.4th at p. 335.)

The court could reasonably conclude that Coronel's statements that she remained in the car and that it was Herrera who shot Noriega were not an attempt to escape blame for the murder because Coronel had a rational reason for not accompanying the other women down the alley. Coronel explained to her friend, "I wanted to do it but it w[as] gonna b[e] to[o] ob[v]ious [and] she felt comfortable with both of [th]em so it w[as] [c]ool." Rather than attempting to escape blame or reduce her culpability, Coronel owns the killing, telling Adriana: "[W]e took her last breath" and "Yeah she[']s dead[.] [W]e didn't rush her or nothing[.] [W]e just gave it to her." Coronel's naming Herrera as the shooter was not an attempt to escape blame for the crime but her way of boasting about what Herrera had done for the gang: "And the potbellied/pregnant girl go the nine and shot her all over her body."

13

**IV.   THE COURT WAS NOT REQUIRED TO GIVE THE JURY THE ACCOMPLICE INSTRUCTION UNDER CALCRIM NO. 334 WITH RESPECT TO CORONEL'S STATEMENTS BECAUSE THEY WERE NOT MADE UNDER "SUSPECT CIRCUMSTANCES."**

Herrera and Lewis argue that the court erred in not instructing the jury under CALCRIM No. 334 that it must decide whether Coronel was an accomplice in the attack on Noriega and, if so, that her statements incriminating Herrera and Lewis must be corroborated and viewed with caution. (*People v. Avila*, *supra*, 38 Cal.4th at p. 562.)[11]

There is little doubt that had it been tendered, the jury would have found Coronel was an accomplice in the murder of Noriega. It does not necessarily follow, however, that Cornonel's text messages had to be corroborated and viewed with caution. As our Supreme Court explained in *People v. Williams*, *supra*, 16 Cal.4th at p. 245, Penal Code section 1111 requires a court to instruct on the need for corroboration and caution only for accomplice "*testimony*." (See fn. 6, *ante*.) In *Williams*, the court held that "'"testimony" within the meaning of . . . section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances. . . . [W]hen the out-of-court statements are not given under suspect circumstances, those statements do not qualify as "testimonial" and hence need not be corroborated under . . . section 1111.'" (*Ibid.*,

---

[11]   CALCRIM No. 334 states in relevant part:  "If you decide that a [declarant] was an accomplice, then you may not convict the defendant of [murder] based on his or her [statement] alone.  You may use the [statement] of an accomplice to convict the defendant only if:  [¶] 1. The accomplice's [statement] is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's [statement]; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime[s]."

quoting *People v. Jeffery* (1995) 37 Cal.App.4th 209, 218 and *People v. Sulley*, *supra*, 53 Cal.3d at p. 1230.)[12]

The *Williams* court concluded that "'[t]he most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.'" (*People v. Williams*, *supra*, 16 Cal.4th at p. 245; quoting *People v. Jeffery*, *supra,* 37 Cal.App.4th at p. 218.)  Here, Coronel's statements were not made under arrest, under questioning by the police or under other circumstances that might be considered suspect.  Instead, it appears from the language and tone of the texts that she made her statements freely and to friends.  As we noted above, a conversation between friends is "the most reliable circumstance" in which a declarant incriminates a defendant.  (*People v. Greenberger*, *supra*, 58 Cal.App.4th at p. 335.)

Therefore, even though Coronel was an accomplice, her out-of-court statements were sufficiently reliable that they did not require corroboration and did not have to be viewed with caution.  (*People v. Sully*, *supra*, 53 Cal.3d at p. 1230:  "The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is itself sufficiently reliable to be allowed in evidence.")

## V.  THE COURT DID NOT ERR IN ADMITTING CORONEL'S OUT-OF-COURT STATEMENT THAT SHE AGREED NORIEGA DESERVED TO DIE AND IN INSTRUCTING THE JURY ON ADOPTIVE ADMISSIONS.

Over Coronel's objection, the court admitted an exchange of text messages between an unknown person and Coronel referring to Noriega's murder.  The unknown individual texted:  "She deserved it for being a whore.  I never liked her."  Coronel

---

[12] The court was not using the term "testimonial" in the Sixth Amendment sense (see *Crawford v. Washington* (2004) 541 U.S. 36) but as the Legislature used the term when it enacted Penal Code section 1111 in 1872.  (*People v. Belton* (1979) 23 Cal.3d 516, 526-527.)  Defendants do not contend that Coronel's text messages were "testimonial" for purposes of the confrontation clause.

answered: "Hahhaha it's true." In another exchange the unknown person asked Coronel: "But did you guys hit her?" Coronel answered: "Yup she[']s dead."

The court ruled that Coronel's responses to the texts were admissible under the hearsay exception for adoptive admissions and, again over Coronel's objection, instructed the jury on how to analyze adoptive admissions. Coronel argues the court erred in allowing the quoted exchanges in evidence and in instructing on adoptive admissions. We disagree.[13]

Evidence Code section 1221 states: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

Coronel's statement—"it's true"—manifested her adoption and belief in the truth of the other person's statement that Noriega "deserved" to die and therefore her statement was admissible under Evidence Code section 1221.

We also reject Coronel's alternative contention that her statement agreeing that Noriega deserved to die should have been excluded as irrelevant. Coronel's response was relevant to her liability as an aider and abettor because it shows that she planned to kill Noriega, not just inflict a severe beating.

Because Coronel did not request an instruction on adoptive admissions (indeed she objected to the court giving one), the decision whether to instruct the jury on how to

---

[13]    CALCRIM No. 357, as modified by the court, states as follows: "If you conclude that someone made a statement in the text messages that accused Ariana Coronel of the crime or tended to connect Ariana Coronel with the commission of the crime and Ariana Coronel did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in her presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the circumstances, naturally have denied the statement if she thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that Ariana Coronel admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or Ariana Coronel's response for any purpose. [¶] You must not consider this evidence in determining the guilt of any other defendant."

analyze an adoptive admission rested in the court's sound discretion. (*People v. Carter* (2003) 30 Cal.4th 1166, 1198.) Coronel contends that the court erred in giving the instruction because there were no adoptive admissions. We reject that contention for the reasons explained above. We find no abuse of discretion in giving the adoptive admission instruction.

## VI. THE PROSECUTOR DID NOT COMMIT MISCONDUCT IN ARGUING ALEMAN AND MENDOZA RISKED THEIR LIVES IN TESTIFYING AGAINST DEFENDANTS.

Defendants maintain the prosecutor committed misconduct by attempting to frighten the jurors during his closing argument.

In explaining to the jurors why they should find Aleman and Mendoza credible witnesses, the prosecutor emphasized the risk they were taking by "snitching" on members of the gang. He told the jury that the two witnesses were "dead people walking" because "if they get caught, they're going to get shot on sight" and that this would be their fate no matter what verdict the jury returned.

The prosecutor also told the jury, "There are unfriendly ears in this court as we sit right now, unfriendly ears that are listening to every single word that is said in this courtroom. And that is getting back to [the gang]."

The defendants objected to these and similar remarks by the prosecutor. The court overruled their objections but instructed the jury that "what the attorneys say during closing arguments is not evidence." The defendants' requests for mistrial were denied.

On appeal, the defendants maintain the prosecutor's remarks were improper because they invited the jury to convict the defendants because the witnesses against them, Aleman and Mendoza, were frightened. Further, the "unfriendly ears" remark suggested that the jurors should be afraid of retaliation from the gang if they convicted the defendants. To support their argument, the defendants pointed out that every time there was a break in the trial, the jurors elected to go to the jury room, where they presumably felt safe.

These arguments are without merit.

17

There was direct evidence that Aleman and Mendoza were afraid their testimony would lead to attacks on them and their families by members of the Easy Riders. The prosecutor's characterization of the witnesses as "dead people" and his prediction they would be "shot on sight" were inferences that could reasonably be drawn from the witnesses' testimony. (*People v. Roberts* (1966) 65 Cal.2d 514, 519-521.) Furthermore, we do not view the prosecutor's characterization of the witnesses as frightened to be an unethical appeal for sympathy. Evidence that a witness is afraid to testify or that a witness is fearful of retaliation has a direct bearing on the credibility of that witness. (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449-1450.)

As to fear on the part of the jury, the court explained that the reason the jurors retired to the jury room during breaks was because the bailiff "provides them [with] coffee and treats there."

**VII.  THE TRIAL COURT ERRED IN GIVING INSTRUCTIONS THAT ALLOWED THE JURY TO CONVICT LEWIS AND CORONEL OF FIRST DEGREE MURDER UNDER THE NATURAL AND PROBABLE CONSEQUENCES DOCTRINE BUT THE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT.**

The trial court instructed the jury that it could convict Lewis and Coronel of murder as aiders and abettors under alternative theories. Either they directly aided and abetted Herrera in the deliberate, premeditated murder of Noriega or they aided Herrera in an assault on Noriega with force likely to produce great bodily injury and murder was the natural and probable consequence of that assault. The jury returned a verdict of first degree murder.

While this appeal was pending, our Supreme Court issued its opinion in *People v. Chiu* (2014) 59 Cal.4th 155. The court held that "[a]n aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine." (*Id.* at pp. 158-159.) The court made clear, however, that "[a]iders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles." (*Id.* at p. 166.)

18

We are left with the question whether giving the erroneous instructions allowing the jury to convict Lewis and Coronel of first degree premeditated murder was, nevertheless, harmless beyond a reasonable doubt. (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) We conclude that it was.

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*People v. Chiu*, *supra*, 59 Cal.4th at p.167.) In *Chiu*, the court found no such valid ground. Indeed, there were indications from the jurors' questions and comments "that the jury may have been focusing on the natural and probable consequences theory of aiding and abetting[.]" (*Id.* at p. 168.) Here, there are no similar indications and the evidence that the defendants directly aided and abetted Herrera in the premeditated murder of Noriega is so strong that we are convinced beyond a reasonable doubt that the instructional error was harmless.

The undisputed facts of this case provide strong evidence of guilt. The evidence established that Lewis was the gang's shot-caller, that only the shot-caller could authorize the killing of a gang member, that Lewis called a gang meeting that Noriega was required to attend, that he made up the story about needing to buy beer and that he drove Herrera, armed with a gun, to a dark alley where she shot Noriega. The evidence also included Coronel's texts setting up the meeting to "take Mickey outta the hood" and her text the day after the murder: "I stayed in the car with [Lewis] because obviously me and the RIP don't get along so the RIP would have smelt it. . . . *I wanted to do it* but it w[as] gonna b[e] to[o] ob[v]ious [and] she felt comfortable with both of [th]em so it w[as] [c]ool." (Italics added.) These facts constitute strong evidence that defendants invited Noriega to go with them for a car ride and agreed to kill her.

## DISPOSITION

Each defendant's judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, Acting P. J.

We concur:

JOHNSON, J.

MILLER, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.